The appellant was indicted for first degree murder of his wife, Lonnie S. Retowsky, "by beating her with his fists and choking her with a cord." The jury found the appellant guilty of murder in the first degree and fixed punishment at life imprisonment. The trial court then entered judgment in accordance with this verdict.
Walter Simmering testified that he lived in Scottsboro, Alabama, and was employed at the Revere Copper and Brass Company. He testified he was the father of Lonnie S. Retowsky, the deceased. Mr. Simmering testified the appellant and the deceased were married in 1958 and moved to Scottsboro in 1968 where his son-in-law, the appellant, was also employed by Revere Copper and Brass. He stated that the appellant and the deceased had three children. He testified that the appellant and deceased had been separated in September 1974, but that in December 1974 during the Christmas holidays, they had made a trip to Baltimore, Maryland, where they each had visited some relatives and returned to Scottsboro just before the first of the year. Mr. Simmering stated that he last saw his daughter alive on the last Sunday in December 1974.
Gerry Cook testified that he had known the appellant about four years and also knew the deceased, his wife Lonnie. He testified that on New Year's Eve 1974-75, he went to a party at the V.F.W. Club in Scottsboro. He testified he saw the appellant and his wife there at the party and that they were dancing. He testified that later, the appellant and the deceased, his wife Lonnie, and a girl by the name of Judy, who worked at the same Holiday Inn where the deceased was employed, all came over to an apartment, No. 115, Carriage House Apartments. Cook stated that at this particular time, the appellant, W.E. "Bo" Retowsky had moved into the apartment with one Fennie Ping. He testified that when he arrived at the apartment, the girl Judy was asleep on the couch and that the appellant and his wife were talking and having some drinks. He said he stayed there about an hour and had a drink and that when he left about 4:00 A.M., Mrs. Retowsky was still alive.
On cross-examination he testified that he had been with the Retowskys and had had some drinks with them at the V.F.W. Club prior to going over to the apartment.
Fennie Ping testified that he lived at 385 Mitchell Drive, Hollywood, Alabama, and was employed by Revere Copper and Brass. He testified that he had known the appellant and his wife for about ten years and that after the appellant had separated from Mrs. Retowsky that the appellant moved into an apartment which they shared at the Carriage House Apartments *Page 195 
in September 1974. Ping testified that he saw the appellant on the night of December 31, 1974, and that he stated he was going to take his wife to a dance at the V.F.W. Club. He testified he went back to his apartment about 10:00 that night, and the appellant was not there and that he did not return to his apartment until about 10:00 the following morning and that he found police officers there.
Judy Dawson Kay testified that she worked at Wilma's Beauty Shop and at the Holiday Inn in Scottsboro. She testified that after getting off work at 10:00 on the night of December 31, 1974, she went to the V.F.W. Club dance with the appellant and Lonnie Retowsky. She testified that they had several drinks and danced there until after midnight and then went to an apartment at the Carriage House Apartments. She said she had a drink and that she next remembered dozing off to sleep on the sofa. She said that a Gerry Cook had come by for a short time, but that she had gone to sleep and that she waked up the following morning about 9:20 on January 1, 1975; that she walked into one of the bedrooms and saw the body of a person which was covered with blood; that the bed and bed clothes were bloody and blood was on the walls. She stated that there was a cord around the neck of the body. She said that at first she could not tell who it was so she telephoned the police department and asked for her father, who was a city police officer, and she told the police where she was and that "someone is dead."
Keith Smith testified that he was a captain with the Scottsboro Police Department on January 1, 1975. He testified that in response to a telephone call, he went to Apartment No. 115, Carriage House Apartments, shortly before 10:00 on the morning of January 1, 1975. He testified he was accompanied by Officer Truman Dawson. He stated that upon arriving at the apartment, they were met by a reserve officer, Potter, and that one Judy Dawson Kay was sitting on the steps to the apartment front door which was open and that she was almost hysterical. Smith said he walked into the living room and into a bedroom where he discovered a body partially covered with a sheet and that the bed and covers on the bed were spattered with blood; there was blood on the walls on the rug and other furniture. He testified there was a cord around the neck of the body which was tied very tight with a bow-type knot. He testified that he then telephoned for his police photographer and other officers and that they then made photographs of the scene. Smith testified that he left the apartment for a short time and went to police headquarters and that upon arrival there, one of the officers introduced him to the appellant, W.E. "Bo" Retowsky. He stated that the first thing he did was to read the appellant a Miranda-type warning and cautioned him that he did not have to make any statement or say anything at all. He stated that the appellant stated to him immediately after he gave him this warning, "I think I killed my wife." Smith stated that he then placed the appellant under arrest for first degree murder and then returned to the apartment to complete his investigation at the scene.
Captain Smith then testified that he had the appellant brought to his office at 12:15 noon time on January 1 and there for a second time, read the appellant a Miranda card warning and advised him he did not have to make any statement whatever and that if he wished to stop talking that he had the right to do so; that he had secured an attorney for him and that there had been no promises, hopes of reward, threats or any type abuse whatsoever administered to the appellant. At this time he took down a recorded taped interview with the appellant which was typed up and that Officer Earl Bishop was present with him during the interview.
After the jury was excluded in accordance with Jackson v.Denno, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908, both the *Page 196 
pre-Miranda and Miranda predicates were inquired into before the trial court determined the statement of appellant to be voluntary. Captain Smith testified that he was first introduced at police headquarters to the appellant by Police Officer John Childress and that the appellant did not appear to be intoxicated, but appeared rather to be in deep thought and that he had come to police headquarters voluntarily and turned himself in. The appellant's interview is fully set forth on pages 83-87 of the record with reference to their activity at the apartment, we find the following in the interview:
 "MR. RETOWSKY: We come back from the dance, me and Lonnie, Judy, I, don't know her last name.
 "MR. SMITH: Judy; could it have been Judy Dawson, used to be Dawson?
 "MR. RETOWSKY: Yes, she is a Dawson; her father is a policeman, or fireman, or something; and we danced and drank; and Gary (sic) Cook came in; and Lonnie started; she got mad at me and started trying to hit me, and all. I was laughing at her; then Cook left; and me and her went into the bedroom; she hit me; I started hitting her and choking her and hitting her and choking her; I think I put a cord around her throat; honest to God, I don't know; I think I did but I don't know.
"MR. SMITH: What were you hitting her with?
"MR. RETOWSKY: My hand.
"MR. SMITH: Did you use anything else?
"MR. RETOWSKY: I don't think so.
 "MR. SMITH: Okay, how many times would you say you hit her?
"MR. RETOWSKY: I honestly don't know.
 "MR. SMITH: Okay, can you tell me why you were in Fennie Ping's room instead of your room?
 "MR. RETOWSKY: She didn't want to go into my room because she said I had other people in there.
"MR. SMITH: Said you had other people in there?
"MR. RETOWSKY: Yes.
"MR. SMITH: Who was in there?
"MR. RETOWSKY: She didn't mean that; she meant.
 "MR. SMITH: Oh, because you have had other people in there in the past?
"MR. RETOWSKY: Yes.
 "MR. SMITH: I see; okay, what were you and her fighting about?
"MR. RETOWSKY: Just fussing, nothing in particular.
"MR. SMITH: Nothing in particular?
 "MR. RETOWSKY: She said, one thing she said, she would, if she asked, I would come right back; and I told her as much as I cared for her, I wouldn't come back cause she had hurt me so bad. Just, really, I don't know what we were really fighting about.
 "MR. SMITH: How long have you lived with Fennie Ping, shared an apartment with him?
 "MR. RETOWSKY: About the middle of September or the first of November.
 "MR. SMITH: Okay, what kind of cord did you tie around her neck?
 "MR. RETOWSKY: I don't know; I don't even know if I did; I think I did.
"MR. SMITH: You don't remember?
 "MR. RETOWSKY: I don't; I think I did but I'm not sure.
 "MR. SMITH: Okay, let me show you a piece of cord and ask you if it, if you remember if this could be the cord that you used to tie around her neck?
"MR. RETOWSKY: I don't know. *Page 197 
"MR. SMITH: Okay, you don't remember?
"MR. RETOWSKY: No.
"MR. SMITH: Okay, you just remember?
"MR. RETOWSKY: I think I did.
"MR. SMITH: You think this is?
"MR. RETOWSKY: I don't.
 "MR. SMITH: You think you remember tying something around her neck?
"MR. RETOWSKY: Yes, I think.
 "MR. SMITH: I see; okay. You say you lived there for several months?
"MR. RETOWSKY: Yes, sir."
Further, through Captain Smith, some photographs were admitted as being made at the scene on the morning of January 1, 1975. The State also brought before the jury a cord which was indicated as having been found at the scene by the officers and retained by them since their investigation, but upon objection and motion by the appellant, the trial court instructed the jury not to consider same and declined to admit this into evidence. The appellant then moved for a mistrial with reference to exhibition of the cord to the jury. After appropriate instructions were given the jury not to consider this, the State rested.
The appellant then presented the testimony of a number of character witnesses, of persons who knew him in the community, in civic work and in his employment at Revere, and testified that his reputation was good.
The appellant then took the stand in his own behalf and told of his marriage; that he was thirty-nine years of age; that he was employed by Revere Copper and Brass for fifteen years and held the position of foreman. He testified that he and the deceased had three children; had formerly lived in Baltimore, Maryland, before moving to Scottsboro in 1968. He testified he was active in his free time in pee wee football, baseball and basketball and that he enjoyed working with young people in sports. He testified that he and his wife had separated for a short time in February 1974, but went back together and remained together until September 1974, at which time they separated. Appellant testified that his wife was employed at the Holiday Inn and that in September, he had moved into an apartment with a friend named Fennie Ping at the Carriage House Apartments. He stated that around Christmas of 1974, he and his wife had driven to visit some relatives in Baltimore and that he and Gerry Cook had stayed with some relatives and that his wife and the other two children stayed with her sister. He testified that they all returned to Scottsboro late on Sunday evening and that after work on Monday, he had dinner with his wife.
Appellant stated that Tuesday was New Year's Eve and that he made plans to get together with some friends and go to a dance at the V.F.W. Club. He testified that he met his wife and Judy Kay, who worked with his wife at the Holiday Inn, and that they went to the V.F.W. Club dance. He stated there was no argument or disagreement at the dance. He further stated that sometime after midnight, he, accompanied by his wife Lonnie and her friend Judy, went over to the apartment at the Carriage House Apartments. He stated that they had gotten a bottle from one Donald Johnson and they fixed some drinks and that later Judy sat down on the sofa and went to sleep.
Appellant stated that later, shortly after three o'clock, his friend Gerry Cook came over and that he saw Cook get up to take a cover from the bed of Fennie Ping and put over Judy Kay as she was sound asleep; that later Cook left and that there was *Page 198 
some conversation about his wife leaving and that at one time his wife said "take me home," and he asked her to wait, and then from the record:
"Q. Did anything happen while Cook was there between you and Lonnie?
"A. She said, she was just swinging at me, roundhouse swinging; and I kept ducking; and we were fussing; and one time, I ducked and she hit the wall or something and busted her thumb there; and that's when I grabbed her and hugged her, you know; and she bit me, not hard, just bit me here when I was holding her; and I asked her, I was kidding her, but let's not hurt each other.
"Q. This was at the time that Cook was there?
"A. Yeah.
"Q. Did you know when Mr. Cook left?
"A. Yeah, he got up and went to the door and Lonnie said something about taking me and Judy over to her house; and I said, `Go ahead, Cook, I will take them home.
"Q. What did your wife say about that?
"A. She didn't say nothing.
"Q. She didn't say anything?
"A. No.
"Q. Did Mr. Cook leave there?
"A. He left.
"Q. Tell the Court and jury what happened next.
"A. Well, I don't know, when we finished a drink or had another drink then we went, I don't know, somehow or another, we went in the bedroom, Fennie's bedroom.
"Q. What happened in the bedroom?
"A. We laid on the bed.
"Q. Were you clothed at that time?
"A. Yes, sir; and we kissed and we got to talking; and she said, I don't know how I got around to it, she said, `Would you still shit to get back to me?' And I slapped her.
"Q. You slapped her?
"A. Yes, sir.
"Q. Where?
"A. Across the mouth.
"Q. Go ahead, please.
"A. Then I went in the bathroom and got a towel and wet it and brought it back in the bedroom; and while I was in the bathroom getting a towel and wetting it down, she had taken all her clothes off.
"Q. This was your wife?
"A. Yes.
"Q. Where was she when you came out of the bathroom?
"A. Laying on the bed.
"Q. Did she have any clothes on at all then?
"A. No, sir.
"Q. Did she say anything to you at that time?
"A. She said, `Come on and get in bed with me.'
"Q. What, if anything, did you do?
"A. I took the towel and wiped where I busted her lip, and we laid there; and I took my — We always had a habit, I didn't have any shorts on; I took my pants off; and I don't know whether I had, if I had underwear on or not; sometimes, I do and sometimes, I don't; and I got in bed with her; we fooled around some; and then I got on top of her; and I don't know whether I entered her or not; but she pulled me down to her; and she had a way of letting me know that things weren't right; she had a way of kissing me that's been for years, that used to kiss me like (witness demonstrated) that; and she kept saying, `I don't want you and I don't want you'; and that's when I started hitting her. *Page 199 
"Q. Did she do this to you at the time when you got on top of her?
"A. Yes, sir.
"Q. What did she do?
"A. She pulled me down and gave me one of those kisses.
"Q. What kind?
"A. One of those like that (witness demonstrated).
"Q. And did she say anything to you?
"A. `I don't want you; I don't want you.'
"Q. This is what she said to you?
"A. Yes, sir.
"Q. What did you do?
"A. That's when I started beating her; I don't know how much I beat her; I don't remember; I tied something around her throat; God only knows what I did.
"Q. Do you remember what all you did?
"A. No, sir; I remember parts of it; I must have, I don't know all of what I did; I couldn't swear what I didn't do.
"Q. Do you even remember leaving the apartment?
"A. I remember being home with the gun; I had to drive home because my car was over there. Captain Smith asked me if I washed up, my hands were clean; so I remember her bleeding and all; so I must have; I don't know if I did that there or over at the house; or I don't know; I had a different shirt on; and I don't remember even putting that on; and I went home.
"Q. You say you went home, you went to Walsh Street, did you?
"A. Yes, sir; and it seemed like I loaded Billy's 12-guage and his .410; and I think I was going to kill myself; and then, I remembered it was daylight; and that's, I think I looked at the clock; but I can't, I don't know, I think it was around ten til ten or something like that; I seemed like sticking in there; and that's when I went to the police station and told them I thought I killed my wife.
"Q. Nobody came to your house and arrested you?
"A. No, sir.
"Q. You drove down to the police station?
"A. Parked my car.
"Q. And you told them you thought you killed your wife?
"A. Yes, sir."
 I
Appellant's counsel asserts that Captain Smith and Officer Dawson lacked probable cause and, therefore, should have obtained a search warrant before entering the apartment where they found the body and made a "search" which produced the cord found on the person of the deceased and photographs of the scene.
We do not agree.
The several exceptions to the warrant requirement are ably stated in the opinion of Mr. Justice Bloodworth in Daniels v.State, 290 Ala. 316, 276 So.2d 441. It is clear here that the officers knew that a homicide had taken place upon arrival at the scene and seeing the door open and Officer Dawson's daughter sitting in the doorway crying in a very upset condition clearly gave rise to the necessary probable cause to enter the premises and determine what had occurred.
Clearly the authorities which are construed under the provisions of Title 15, § 154, Code of Alabama 1940, permit an officer to make an investigation where, as here, he has been notified of the commission of a felony and enters the scene unaccompanied by a warrant. Many of these were reviewed by Mr. Justice Lawson in *Page 200 Duncan v. State, 278 Ala. 145, 176 So.2d 840. Recently, this Court has also determined, as here, that probable cause existed and we do so determine now. Bridges and Rogers v. State,52 Ala. App. 546, 295 So.2d 266; Burrow v. State, 55 Ala. App. 24,312 So.2d 596. The search of the apartment where the homicide took place was in all respects proper.
 II
Objection was made to the admission in evidence of the photographs made at the scene of the homicide as being too gruesome. These were properly received in evidence. Smarr v.State, 260 Ala. 30, 68 So.2d 6; Nichols v. State, 267 Ala. 217,100 So.2d 750; Brodka v. State, 53 Ala. App. 125, 298 So.2d 55.
 III
The appellant next asserts that his statement given Captain Smith was not "voluntary" and, therefore, should not be admitted.
We find here that prior to any questioning whatsoever, Captain Smith fully advised the appellant of his rights underMiranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602,16 L.Ed.2d 694, 10 A.L.R.3d 974, and in addition, the record here discloses a full pre-Miranda predicate. We are of the opinion that the trial court properly determined the voluntary nature of this statement and such was, therefore, properly admitted at the trial. Hardy v. State, 51 Ala. App. 489, 286 So.2d 899;Kendrick v. State, 55 Ala. App. 11, 312 So.2d 583; McClendon v.State, 54 Ala. App. 327, 307 So.2d 723; Fleming v. State,57 Ala. App. 556, 329 So.2d 616.
 IV
Appellant asserts that his motions for a mistrial were improperly overruled. In the first instance, he calls attention to the examination of Police Captain Smith wherein following his description of his investigation on the morning of January 1 at the apartment, he described removing a cord tied very tight around the neck of the deceased with a bow-type knot and then stated that it had been in his custody since that time. Though the trial court declined to admit the cord on the objection of the appellant, we believe that the trial court here correctly overruled the motion for a mistrial as follows:
"THE COURT: Sustain the objection.
 "MR. LIVINGSTON: If it please Your Honor, we would like to move for a mistrial. The cord is still in the presence of the jury, and we would like to move for a mistrial.
 "THE COURT: Your motion is denied and overruled. Gentlemen of the jury, the Court has sustained the objection to certain items about which this witness has testified to some cord of some sort. You are not to consider the cord in arriving at your verdict; you are to disregard the cord altogether. That is not to say that you can disregard the testimony of what the witness has said about it; he has a right to testify as to what he says he saw; but as to the cord itself, we have sustained the objection to the cord. You are to disregard the physical evidence of the cord itself altogether in arriving at your verdict in the case.
"MR. LIVINGSTON: We except, Your Honor."
We note here the trial judge took the necessary steps to remove any possible prejudicial effect of the exhibition of the cord to the jury. Moreover, we are of the view that the cord could have been properly admitted under the testimony of the investigating officers. No error in this respect is here shown.Poellnitz v. State, 48 Ala. App. 144, 262 So.2d 631, and authorities therein cited. *Page 201 
The rule covering this has been stated by our Supreme Court in Shadle v. State, 280 Ala. 379, 194 So.2d 538:
 ". . . [I]t is well recognized that the granting of a mistrial is within the sound discretion of the trial court, for he, being present, is in a much better position to determine what effect, if any, some occurrence may have upon the jury's ability to decide the defendant's fate fairly and justly. And we will not interfere with the trial judge unless there had been a clear abuse of discretion. . . ."
During the cross-examination of the character witness, called in rebuttal by the State, the following answer was given by the witness Mr. Roden (R.p. 175). Appellant also moved for a mistrial.
 "Thank you, sir. Yes, sir; I knew it very well; the man attacked me."
The trial court then promptly admonished the jury that the altercation between this witness and the appellant had no bearing on the issues in this case; that such had no bearing on the guilt or innocence of the appellant and was to be disregarded entirely. The trial judge then asked the jury if there was anyone among them who could not obey his instructions and that such response was not responsive to the question and should not have been given. The record indicates that no juror responded to the trial judge's inquiry, and in light of these instructions, we are of the opinion that no error was here shown. Adair v. State, 51 Ala. App. 651, 288 So.2d 187, and authorities therein cited.
 V
On the next instance, the appellant asserts that the following question asked on cross-exmination with reference the reason the appellant did not sign the statement given in the interview with Captain Smith constitutes reversible error:
"CONTINUATION BY MR. ARMSTRONG:
 "Q. The only reason you didn't sign it is because your attorney advised you not to?
"A. Yes, sir.
"MR. LIVINGSTON: We object.
"THE COURT: Overrule.
"THE COURT: You may come down, please."
As may be seen from reviewing the above cross-examination, the defense counsel did not object until after the question was answered. Clearly, his objection came too late. Barnett v.State, 52 Ala. App. 260, 291 So.2d 353, and authorities therein cited. Moreover the appellant did not move to exclude or invoke a further ruling from the trial court, hence such answer is not properly before us for review. Veith v. State, 48 Ala. App. 688,267 So.2d 480.
 VI
After an extensive oral charge, the appellant announced "no exceptions." The trial court then gave thirteen of the written requested charges and refused six others. We have carefully examined each of the refused charges and determined they are either affirmative in nature, and therefore properly refused under the evidence, or were incorrect statements of the applicable legal principles, hence their refusals were proper. Title 7, § 273, Code of Alabama 1940.
We have carefully examined the record as required by law and find same to be free from error. The judgment of the trial court is hereby
AFFIRMED.
All the Judges concur. *Page 202