TYSON, Presiding Judge.
The appellant, Bessie S. Williams, alias, was indicted for the first degree murder of one Charles Jackson “by shooting him with a pistol.” The jury found the appellant guilty of murder in the second degree and fixed punishment at fifteen years imprisonment. The trial court entered judgment accordingly, and, following the filing of a motion for new trial and a hearing thereon, overruled same.
Phillip Paradise, Jr., testified that he was employed by the Montgomery Fire Department, and he identified a photograph of one Charles Jackson, an uncle by marriage, who is now deceased.
Leroy Fuller, an employee of the Pekin Cafe in Montgomery, Alabama, stated that on the evening of September 23, 1976, he attended a high school football game at Cramton Bowl, accompanied by Charlie Briggs, Betty Floyd, and the appellant, Bessie Williams. The group took a bottle of wine and a bottle of gin. Upon leaving the football game, they stopped at the “Cozy Room” on the corner of Monroe and Lawrence Streets where each had one beer. The group then drove to the “Cool Breeze,” *831 or “House of Breeze,” a night club on Cleveland Avenue. While there, the group encountered Charles Jackson, the deceased, who was “spinning records.”
According to Fuller, the appellant, Bessie Williams, was “back and forth through the place, having some beers and dancing.” She was observed seated at the bar, talking with the deceased, Charles Jackson. Fuller indicated they were there about two hours, and that he went outside to the car and went to sleep. He stated that he sent word through a friend to Charles Jackson that he would be sitting outside to drive him home. Fuller stated that he was awakened by the sound of some noise and an argument between Charles Jackson and Bessie Williams. Fuller indicated that Jackson and Williams had gotten in the car, then began tussling, and their feet were inside the car and their bodies outside on the sidewalk. From the record (R. pp. 15-16):
“Q. And what happened after that?
“A. And Bessie got in and they started tussling.
“Q. Okay.
“A. And by that time they went out of the car. Their heels were in the car, but they was outside the car.
“Q. Okay. What happened?
“A. After that a shot fired once and by that time I got out the car, but when I got around, around the back of the car, she was standing with the pistol pointed and he was sitting in the car and at that time she shot him.
“Q. Okay. Let me ask you this, please. You’re saying Charles Jackson got in the car and was sitting down when the Defendant got in the car?
“A. Yes.
“Q. All right. Now, where was Deborah Robinson, please?
“A. Her and Bessie come out together.
“Q. Okay. They came out together, about the same time?
“A. Yes.
“Q. Okay. Did you know whether or not the Defendant, Bessie Williams, had a pistol?
“A. I know she used to have one.
“Q. Okay. Did you say anything to either Bessie Williams or Deborah Robinson in reference to a pistol or the whereabouts of a pistol while they were tussling out there?
“A. I said something about the pocketbook.
“Q. And what did you say about the pocketbook?
“A. I said: Give me your pocketbook or something like that. I said something about the pocketbook.
“Q. And who did you tell that to?
“A. Anne Robinson.
“Q. And what did Anne Robinson say, or do you recall?
“A. I can’t recall that.”
On cross-examination, Fuller indicated that he had had several glasses of wine and beer during that evening as he was tired, that he had gotten up before 6:00 o’clock that morning. He admitted giving the police officers a signed statement that evening concerning the shooting, in which he stated he saw Deborah Robinson trying to get into the car, but that she did not make it because Charles Jackson and the appellant were “tussling.” Fuller stated that the appellant’s head and shoulders were on the ground, and that the deceased was on top of her when he heard the first gunshot. He stated he got out and ran around the car, then saw the appellant fire a second shot into the automobile in the direction of Jackson, the deceased. Fuller estimated that just a few seconds elapsed between the two shots.
Fuller also indicated that immediately after the shots were fired, the appellant and Deborah Anne Robinson got in the car and asked him to take them to the emergency room at St. Margaret’s Hospital. Fuller indicated that he and Jackson were good friends and had formerly worked together at T. G. & Y. in Montgomery.
Deborah Anne Robinson, an employee of the Pekin Cafe in Montgomery, indicated that on the night of September 23, 1976, she, accompanied by Bessie Williams, the appellant, Charlie Briggs, and Leroy Fuller, *832 went to a high school football game at Cramton Bowl. Robinson indicated that the group stopped by the “Cozy Room” and had one beer each, then drove over to the “House of Breeze” on Cleveland Avenue in Montgomery, Alabama, arriving there shortly before 11:00 o’clock in the evening. Robinson indicated that she sat “at the bar, drinking a few beers and danced.” She stated that Charles Jackson, the deceased, was the disc jockey there, and there was a record hop going on. She stated that Bessie Williams was observed having a few beers, dancing, and talking with Charles Jackson. She stated the group stayed there until about 1:00 the next morning when they walked outside, that Fuller was already in the car waiting for them.
Robinson stated she overheard part of the conversation between Jackson and Williams, that Jackson was “fussing because Williams had ordered a bowl of soup and pig feet and she told Jackson that he was going to pay for it.” She stated the argument was over the food and who was to pay. Robinson indicated that she heard the appellant tell Charles Jackson “that she was going home, she didn’t care if he didn’t go, but she was going because she had to go to school.” She stated that the two began “tussling and arguing,” and the “way I seen it, Bessie hit Charles first.” From the record (R. pp. 44-45):
“Q. Okay. And then they started tussling; and you got out of the car, is that correct?
“A. Yes.
“Q. What, if anything, did you see then? “A. Bessie going for her gun.
“Q. Okay. And where was the gun, if you know?
“A. In her bra.
“Q. Okay. Had you seen that gun earlier that night?
“A. Yes.
“Q. And where was it when you saw it earlier?
“A. Me and Bessie went to the bathroom together and she took it out of her pocketbook and put it in her bra.
“Q. Took it out of her purse and put it in her bra?
“A. Yes.
“Q. Okay. Now, how many shots did you hear out there that night, please? “A. Two.
“Q. Okay. Now, when you heard the first shot, where was Charles? What were they doing, if you recall?
“A. The way I seen it, he was in the car.
“Q. Okay. When you heard the second shot where was Charles?
“A. In the car.
“Q. Okay. What was he doing in the car on the second shot?
“A. He was laying back.
“Q. Okay. Now, what, if anything . Where was Bessie Williams when you heard the second shot?
“A. She also was in the car.
“Q. She was in the car or was she standing out beside the door? Where was she?
“A. The way I seen it she was in the car.
“Q. She was in the car and Charles was in the car lying back. Where were you then, please?
“A. In the car.
“Q. When you heard the shots, I mean.
“A. Standing beside the car door.
“Q. Standing beside the car door. Okay, now, what if anything, did Bessie do after she shot Charles?
“A. She said she done shot Charles and told Leroy to take her to the Emergency.
“Q. Now, did you ever see Charlie with a weapon?
“A. No.
“Q. Was Charlie beating her when you heard the second shot?
“A. I ... No.
“Q. Did you go down to Police Headquarters that night? Did you see the police at the hospital or anywhere out there that night?
“A. Yes.”
Robinson indicated that she did not give the police a statement that night because “she was scared and nervous.” She identified a purse which she said contained the pistol used by the appellant that night.
*833 On cross-examination, Robinson indicated that she had quite a few drinks that night, but that the appellant “passed the first lick,” and she heard two shots. She admitted on cross-examination that when she heard the first shot, Charles was on top of Bessie, and that she had stated this to the appellant’s attorney. She further indicated that she told the appellant’s attorney, “It seemed the appellant was struggling to get the pistol.” Robinson also indicated that later she gave the police a statement concerning the incident in question.
Richard A. Roper, State Toxicologist, stated that he performed a post-mortem examination on one Charles Jackson on September 24, 1976. He found a wound “located in the forehead on the right side.” He further indicated that during the course of his examination, several bullet fragments were found and removed. He stated that “death resulted from central nervous system trauma or, a brain injury, and inter-cranial hemorrhage, or bleeding, inside the skull. So, central nervous system trauma; intercranial hemorrhage, subsequent to a single gunshot wound to the head.” Dr. Roper indicated that the wounds were consistent with a .22 pistol shot, that he performed a blood alcohol test and the blood contained alcohol at a level of .15 per cent, and that Jackson “would be considered to be unequivocally intoxicated.” Dr. Roper stated the body measurement was a height of five feet, nine inches, and the weight was approximately a hundred and sixty pounds.
Montgomery Police Detective Lawrence G. Rutland testified he first saw Bessie Williams on September 24,1976, at St. Margaret’s Hospital in Montgomery. Rutland testified that he advised the appellant of her “Miranda rights” before any questioning, and that the questioning took place at Police Headquarters after she was brought there by Officers Stewart and Evans. He stated that he questioned her for about ten minutes in Room 204 at Headquarters after first advising her that she did not have to give any statement, that it could be used in evidence against her, that she had a right to confer with an attorney, and that one would be appointed for her if she could not afford one.
Rutland also stated that the appellant was offered no hope of reward, or any inducement whatever, and there was no threat or intimidation of any kind made in order to obtain a statement. He indicated that the appellant did not appear to be intoxicated, but had been drinking, that she gave him an oral statement, which he wrote down in notes, but that she declined to sign a written statement. From the record (R. pp. 77-78):
“THE WITNESS: She told me that they had been inside . . . That she had been at Cramton Bowl to a ball game and she got this Fuller subject to carry her to the House of Breeze. She stated that once they got to the House of Breeze that they was having a record hop there and that Charles Jackson was part of the record hop — this was her boyfriend that she went there to meet. She stated she had something to eat in the House of Breeze and once they got ready to go that her and Charles Jackson got into an argument as they was en route to the car about the stuff that she had charged there at the House. She stated that en route to the car was when they got into the argument and at this time he had slapped her and knocked her down and this was when she reached for her pistol because she knew that Charles Jackson normally carries a pistol on him. This is when she fired the pistol, while she was on the ground.
“MR. PRICE: Thank you. I have no further questions.”
On cross-examination, Officer Rutland indicated that at the hospital he only obtained the names of witnesses and then they transported her to Police Headquarters. Rut-land further stated that after typing up her statement and reading it back to her, Bessie Williams stated “she did not want to sign it.” She stated to Rutland that she was willing to give an oral statement, but did not want to give a written statement until she talked with her attorney. This state *834 ment was made after advising her of her right to have an attorney.
The appellant then took the stand for the limited purpose of testifying concerning the voluntariness of her statement to Police Sergeant Rutland. She stated that she talked with Rutland at Police Headquarters for about ten or fifteen minutes in a room, and there was no one else present. Williams indicated that Rutland told her it was necessary to get fingerprints and a photograph made, that she told Rutland that she did not want to do anything before talking with an attorney, and that she did not want to answer any questions. She denied being given a warning before giving an oral statement.
Montgomery Police Identification Officer T. R. Shanks stated that he examined the clothing of Charles Jackson and found no weapon in them.
The appellant’s motion to exclude the State’s evidence was overruled. Also, the appellant made a motion to reduce the degree of homicide as to each degree thereof, and this was denied.
Reverend Joseph W. Bozeman indicated that he was pastor of King Hill Baptist Church in Montgomery, and that Bessie Williams had attended his church for the past five and one-half years. He stated that he was familiar with her reputation, and that she was a nonviolent person and honest.
Montgomery Sheriff’s Deputy Billy White identified a pistol permit issued to Bessie Williams on June 23, 1976, for a CDM .22 caliber pistol. He stated the reason given for the permit was “self protection.”
Bessie Williams, age twenty-eight, testified she lived with her mother and three children at 3324 West Tuskegee Circle in Montgomery, and that she was employed at Empire Rouse Cleaners. She testified on the night of September 23-24, 1976, she went with Ethel Floyd, Charlie Briggs, Leroy Fuller, and Anne Robinson to a high school game at Cramton Bowl, that after the game, they stopped by the “Cozy Room” and had a beer. The group then rode with Leroy Fuller to the “House of Breeze” on Cleveland Avenue, arriving there between 10:30 and 11:00 p.m. She stated that Charles Jackson was the disc jockey there, and they had a beer and danced. Williams indicated that she had known Charles Jackson for approximately two and one-half years and had dated him in the past.
Bessie Williams indicated that the group left around 1:00 a.m. because she was to go to school that day. She stated that Charles Jackson had asked Leroy Fuller to take them home, and Fuller was waiting outside in the car for them. Appellant stated that she ordered some food and asked Charles Jackson if he minded paying for it. She stated she ordered a bowl of stew and “pickled pig feet,” that Jackson got mad and said she had been ordering food off and on and charging it to him. She denied making a statement that she was going to get Jackson when they got home because she was not going home that night. Williams indicated that she asked Deborah Anne Robinson to ride home with them, that Jackson had been drinking a lot, and she did not want to ride home alone with him. Williams indicated that when Jackson drank a lot he became aggressive, that he had struck her two or three times in the past.
Williams indicated that she, Deborah Anne, and Charles Jackson left the House of Breeze, walking toward Fuller’s car, which was directly across the street. She stated that Jackson got in the car first, and as she was trying to place the food in the car, Jackson began shoving and pushing her. She stated that Jackson hit her with his left hand and she threw up her hands to protect herself. She stated Jackson’s blow knocked her out of the car, that her head and shoulders hit the pavement, and it made her “sort of dizzy.” Jackson was then on top of her trying to choke her, and she heard Jackson ask Fuller to look in her pocketbook for her pistol. She said that Jackson then began trying to reach under her blouse, and she pulled her pistol and fired once straight up in the air. Jackson then jumped back in the car, and she saw *835 his hand go into his pocket as though to pull a weapon, and she fired one time in his direction. Williams stated she had no intention of killing Charles, and that she then asked Deborah Robinson and Fuller to take them to the hospital.
On cross-examination, Williams indicated that Jackson had been drinking a good deal that night, but that she had had only two or three beers at the “Cool Breeze” before the argument over the food.
The appellant was then asked about certain statements which she gave Detective Rutland on the morning of September 24, 1976, at Police Headquarters.
The appellant’s attorney, at trial, objected to the laying of this predicate, saying that such statements were not shown to have been voluntary, and were in violation of Miranda. Following the overruling of this objection, the appellant did indicate that she gave Detective Rutland a statement, but denied stating that Jackson was seated in the ear, and that she walked over to the car and shot him. The appellant stated that she had gotten completely into the car and was attempting to place the food out of her hands when Jackson began pushing her and hitting her. She denied being intoxicated or feeling high, and said she had one gin and tonic, and possibly three beers that evening.
Montgomery Police Detective L. G. Rut-land was recalled to the stand and stated that after briefly speaking to the appellant at St. Margaret’s Hospital, she was taken to Police Headquarters by two other officers. Detective Rutland stated that at Police Headquarters, and before talking with her, she was fully advised of her “Miranda rights,” as follows (R. p. 129):
“City of Montgomery, Alabama, Department of Police. Name: Bessie Williams; Black Female; Place: Detective Office; Date: 9/24/76; Time: 3:20 a.m.; Charge: Murder. Before asking you any questions, I must explain to you that you can remain silent, that anything you say can be used against you in Court, that you can talk to a lawyer first and that you have the right to the advice and presence of a lawyer even though you cannot afford to hire one. If you cannot afford to hire a lawyer and want to have one present during interrogation, the Court will appoint one before we question you. If you want to answer questions now you can do so, but you can stop answering at any time. Signed by me, L. G. Rutland. I fully understand the foregoing statement and do willingly agree to answer questions. I understand and know what I am doing. No promise or threats have been made to me by anyone and no pressure of any kind has been made against me by anyone. It is typewritten: Bessie Williams, and she refused to sign.”
Detective Rutland stated that while the appellant did appear to have been drinking, she was not intoxicated and indicated that she fully understood her rights, that there was no coercion, inducement, intimidation, or threat made or offered in order to obtain her statement. From the record (R. pp. 132-133):
“Q. Okay. I ask you specifically whether or not . . . where the Defendant told you Mr. Jackson was when she shot him in the head?
“A. Well, she stated that the first time she fired the pistol that she was lying on the ground and he was crouched over her. She stated she fired the pistol at this time; he backed up to sit down on the edge of the seat of the car and she walked over toward the vehicle and fired again.
“Q. Okay. Did the Defendant . will you state, then, as to what the Defendant told you in respect to where she was when they first started tussling; whether or not they were in the back seat of the car or whether or not they were walking toward the car?
“A. She told me that they had just left the House of Breeze and was going toward the car.
“Q. Did she tell you what allegedly took place between the house and the car in respect to whether or not Mr. Jackson slapped her, hit her, pushed her or what?
*836 “MR. MANDELL: We object to the leading question.
“THE COURT: Sustained.
“MR. PRICE: I will withdraw and rephrase it, Your Honor. Did she tell you with respect to what took place, if anything, between she and Mr. Jackson on the way from the house to the car? “A. She told me that she had purchased some food inside the Housb of Breeze and that she and Jackson got into an argument about this — He had to pay for the food. On the way to the car they were still having some discussion or argument about this and at this time he slapped her.
“Q. She told you that he slapped her on the way to the car?
“A. That’s right, and she fell to the ground.
“MR. PRICE: I have no further questions.”
On re-cross-examination, Detective Rut-land indicated that his testimony on rebuttal was based upon notes made at the time of talking with the appellant at Police Headquarters. He indicated that he wrote the conversation down verbatim after conferring with her from 3:20 to 3:30 a.m. on September 24, 1977, in the interrogation room at Police Headquarters. He stated that she was the only witness he talked with concerning the shooting of Jackson, that he wrote out her statements, had them typed up, but she declined to sign the statements.
I
The appellant asserts that the trial court erred in allowing testimony to be given by Detective Rutland concerning the statements made by her at Police Headquarters on the morning of the incident in question without first determining that such statements were voluntarily given, and that the appellant was properly apprised of her constitutional rights.
We have carefully examined the testimony of Detective Rutland, which affirmatively reflects that the appellant was properly advised of both her “Miranda rights,” and also that there was no coercion, intimidation, hope of reward, threat, or inducement made in order to obtain her statements. The record discloses that she was interrogated for about ten to fifteen minutes at Police Headquarters before making her oral statements in the police interrogation room at Police Headquarters.
No intimidation or abuse of the appellant is here shown by the record. We are of the opinion that the trial judge’s conclusion that the appellant’s statements were voluntary is adequately supported by the facts, Shewey v. State, 48 Ala.App. 730, 267 So.2d 520, and therefore the trial judge properly admitted the appellant’s alleged statements into evidence in this cause. Bills v. State, 49 Ala.App. 726, 275 So.2d 706, and authorities therein cited.
II
Appellant next contends that the trial court erred in not granting her motion for a mistrial based upon the District Attorney’s remarks and his “flamboyantly” waving the statement while interrogating the appellant on cross-examination. This matter is as follows (R. pp. 122-124):
“Q. Now, Ms. Williams, do you recall telling the police that Mr. Jackson was sitting in the car and you walked over to the car and shot him?
“A. No, I was standing right by the door.
“Q. Well, you do recall giving the police a statement that night, is that correct?
“A. Yes.
“Q. Okay. Will you now look, then over this statement and read it?
“MR. MANDELL: Your Honor, again—
“THE COURT: Sustained.
“Q. Well, to refresh your present recollection, can you testify about what you told the police that night without the aid of the statement?
“MR. MANDELL: I believe she has testified—
“A. I told you what I could tell you about it.
*837 “Q. And in your opinion, then, you have testified accurately about the statement?
“A. Yes.
“Q. Okay. Then, I’ll ask you again: Did you recall telling the police that Mr. Jackson was sitting in the car and you walked over to the ear and shot him?
“A. No.
“Q. Would you say, if that is what’s in the statement—
“MR. MANDELL: I object, Your Honor.
“THE COURT: Sustained.
“MR. MANDELL: And make a motion to exclude that.
“THE COURT: So granted. The jury will disregard the last statement by the District Attorney.
“MR. PRICE: Well, Your Honor—
“THE COURT: Sustained.
“MR. PRICE: Your Honor, maybe the jury should go out again.
“THE COURT: Ladies and gentlemen, will you please step back out.
“(Whereupon, the following was held out of the presence of the jury as follows:)
“MR. MANDELL: Your Honor, at this point I would like to make a motion for a mistrial. If you will just let me state, if I may, that is far beyond the bounds, to walk around with a police statement to the jury and say this police statement that I have, here.
“MR. PRICE: I never said this police statement, Your Honor.
“MR. MANDELL: Well, just let me close to that, Your Honor. I know Your Honor granted the motion to exclude, but—
“MR. PRICE: Your Honor, I don’t know how—
“THE COURT: Just a moment—
“MR. PRICE: How I could impeach the witness—
“THE COURT: Just a moment. The motion is hereby denied. I have granted your motion to exclude that statement to this jury and it’s the Court’s opinion that that has cured anything. I have also admonished counsel for the State not to walk around with any kind of police statement any more in his hands, period, and the statement is not to be carried around nor is it to be referred to as a statement. You may ask her whether or not she told the police that night, questions. You may ask those questions. If she denies telling the police anything such as that you may call in the officer to whom those questions were made by and he may testify that she told him certain things, but that is not a statement by this witness.
“MR. PRICE: Well, only this witness can say whether this is a statement by her, Your Honor. I know it’s not signed, I know it’s not signed—
“THE COURT: I am telling you the proper procedure to follow. Any other procedure, if you do it again, I am going to grant a mistrial.
“MR. PRICE: Well, Your Honor, I will just join in the motion for a mistrial now.
“THE COURT: Both motions are denied. Now, are we ready to go back?
“MR. PRICE: I guess we are, Judge.
“THE COURT: Then, let me see both counsel in my chambers.”
In Shadle v. State, 280 Ala. 379, 194 So.2d 538, we find the following:
“. . . [I]t is well recognized that the granting of a mistrial is within the sound discretion of the trial court, for he, being present, is in a much better position to determine what effect, if any, some occurrence may have upon the jury’s ability to decide the defendant’s fate fairly and justly. And we will not interfere with the trial judge unless there had been a clear abuse of discretion. . . . ”
In light of the prompt admonishment of the trial judge to the jury and the admonishment to the attorneys, we are of the opinion that no error is here shown. Napier v. State, Ala.Cr.App., 337 So.2d 62; and Retowsky v. State, Ala.Cr.App., 333 So.2d 193.
Ill
The appellant’s attorney excepted to the oral charge of the trial court pertaining to its charge which included the provisions *838 of Title 14, Section 316, Code of Alabama 1940. This section is as follows:
“Same; killing in sudden rencounter with concealed weapon. — When the killing in any sudden rencounter or affray is caused by the assailant by the use of a deadly weapon, which was concealed before the commencement of the fight, his adversary having no deadly weapon drawn, such killing is murder in the second degree, and may, according to the circumstances, be murder in the first degree.”
Under the evidence in this cause, the State’s witnesses testified that Jackson, the deceased, was unarmed, and that Williams “struck the first blow.”
Under this statement of the evidence, the trial court properly included the above Code section in its oral charge. Thus, no error is shown.
Likewise, the use of the .22 pistol by the appellant constituted a proper basis for the trial court to charge on the question of malice. Likewise, no error is shown.
IV
Appellant’s counsel submitted a large number of written requested charges which were refused by the trial judge.
A large number of these were affirmative in nature, and therefore properly refused under the conflicting evidence.
As to the remaining refused charges, we have carefully examined each and find that such were either incorrect statements of applicable law, argumentative under the evidence and therefore invasive of the province of the jury, or were fully and substantially covered in the trial court’s oral charge, therefore their refusals were proper. Title 7, Section 273, Code of Alabama 1940; Prince v. State, 50 Ala.App. 368, 279 So.2d 539, cert. denied, 291 Ala. 796, 279 So.2d 549.
We have carefully reviewed this record, as required by law, and find same to be free from error. The judgment of the trial court is due to be and the same is hereby
AFFIRMED.
All the Judges concur.