Russell R. Lippold and Patricia Ann Kerley Gregg were charged by indictment with the first degree murder of Lester Gordon Mullins by shooting him with a gun. Because the appellant was fourteen years of age at the time of the incident in question, the Circuit Court heard a motion to transfer the cause to the Juvenile Court, and after a determination in that court of incorrigibility the cause was then transferred to the Circuit Court for trial as an adult. The jury found the appellant guilty of murder in the first degree and fixed punishment at life imprisonment in the penitentiary. The trial court then set sentence in accordance with this verdict.
The indictment and ensuing trial arose from an incident which occurred during the *Page 1016 
early morning hours of May 24, 1977, at an Amoco station, just off Interstate 59, near Collinsville, Alabama, in DeKalb County. There Lester Gordon Mullins, the attendant at the service station, was found dead at about 2:30 or 3:00 a.m. The cash register drawer was open and the proceeds were missing.
The appellant, Russell R. Lippold, age fourteen, and his companion, Patricia Ann Kerley Gregg, age twenty-six, were arrested by Ohio State Trooper Robert K. Sikes shortly after 11:00 on the evening of May 24, 1977, at a rest stop on Interstate 75, near Dayton, Ohio. There Gregg and Lippold were found in a brown and beige 1977 pickup truck with a Kentucky license tag, No. FEO-261. Following the arrest of the occupants and the seizure of the items contained in the truck by Trooper Sikes, Lippold and Gregg were returned to Alabama for trial. Thereafter, several issues arose during trial which will be set out and discussed in this opinion.
 I THE INVENTORY SEARCH
At trial, Trooper Robert K. Sikes testified that, shortly after 11:00 p.m. on May 24, 1977, he observed a brown and beige Chevrolet pickup truck parked in a rest stop area. He stated that the truck bore a Kentucky license plate, No. FEO-261. Trooper Sikes noted that the rest stop area is designed so that normally a vehicle is pulled in and parked with the rear of the vehicle facing outward. He testified that, on the evening in question, the truck above-described was "backed in" and parked at a point near a drinking fountain where the troopers are required to sign a sheet and register. Trooper Sikes related that it is a requirement of the Ohio State Troopers' regulations for a routine check to be made of all out-of-state vehicles to determine if any among those reported are stolen or if they contain missing persons.
Upon receipt of information from Headquarters that the truck in question had been reported as stolen in Kentucky, Trooper Sikes radioed for assistance of other officers. Upon arrival of the additional officers, they approached the vehicle and observed the appellant, Russell Lippold, seated on the passenger's side and his companion, Patricia Gregg, seated under the steering wheel. Trooper Sikes related that he was on the right side of the vehicle and a fellow trooper on the left when they awoke the occupants and directed them to raise their hands and slowly alight from the truck. Gregg and Lippold followed instructions, were handcuffed, and their persons searched. Trooper Sikes stated that he immediately gave aMiranda warning before handcuffing the two individuals. Trooper Sikes then called for a wrecker to tow the truck, and while awaiting arrival of the wrecker, pursuant to Ohio State Troopers' regulations, he conducted an inventory search of the vehicle as to its contents. Sikes related that both the occupants had been removed from the truck and upon investigation he observed a twelve gauge shotgun lying on the floorboard of the truck with a part of same extending from underneath the front seat. Sikes related that he removed a pocketknife from the appellant's pocket, then continued to search the truck. The items contained therein were inventoried. Sikes related that he found one shell inside the shotgun and seventeen additional shells in the glove compartment. He stated that these shells were twelve gauge, No. 4, shot. Sikes described the shotgun as having a sawed-off barrel, with part of the handle also sawed-off. He stated that a type of padding was "taped to the handle where the butt was." Sikes further related that a machete, a knife, some bed clothing, and a type of feed were also found in the truck. Sikes indicated that he kept the sawed-off shotgun and shells in his possession until they were delivered to Alabama Investigator Bethune, who came to the Miami County, Ohio, Sheriff's Office in Troy on May 26, 1977. Trooper Sikes indicated that all of the items were retained in his possession and under his control until they were delivered to Investigator Bethune.
Investigator Gerald Bethune from the DeKalb County Sheriff's Office testified *Page 1017 
that he received the shotgun and other stated items from Ohio State Trooper Sikes on May 26, 1977, in Troy, Ohio, and subsequently delivered the shotgun to Brent Wheeler of the Alabama Toxicology Department in Huntsville, Alabama, as well as the seventeen shells found in the glove compartment of the truck and the one shell found in the chamber of the shotgun. Investigator Bethune also identified the photographs made of the 1977 brown and beige Chevrolet pickup truck, bearing a Kentucky license plate, No. FEO-261, which he had taken off the vehicle. He stated that he had visited with the owner of the truck in Cynthiana, Kentucky, on June 7, 1977, and made photographs of the truck. Bethune indicated that the shotgun shells bore the trade name, "Mohawk," which is manufactured by Remington.
State Toxicologist Brent Wheeler testified that, on May 31, 1977, he received a "Mariton 12-gauge single barrel shotgun with a 16 1/4 inch barrel, bearing the serial number 24135" from State Investigator Bethune. He also received some "12-gauge Remington Mohawk # 4 shot, all of which were unfired," together with two five dollar bills, and a red, white and blue, short sleeved uniform shirt. Mr. Wheeler indicated that he performed certain test for fingerprints, and test-fired the shotgun. He stated that other than that all the items were in the same condition as when he received them from Investigator Bethune. In comparing the wadding removed from the body of the victim with the wadding used in the shells delivered to him by Bethune, Wheeler determined they were made by the same manufacturer and were of the same size as that in the "12-gauge # 4 shot" shells delivered to him by Bethune.
At trial, counsel challenged the admission of the above-listed items as being based upon an illegal search and seizure without probable cause or without a warrant.
The State countered this argument by pointing out that Ohio State Trooper Sikes was following department regulations when making an inventory search of the vehicle after it had been determined to be a stolen vehicle from Kentucky. The initial charge against the two occupants, Lippold and Gregg was car theft.
Moreover, the State pointed out at trial and on appeal that the appellant, Lippold, and his companion, Patricia Gregg, had no standing to challenge the seizures by Trooper Sikes.
The United States Supreme Court in South Dakota v. Opperman,428 U.S. 364, 96 S.Ct. 3092, 49 L.Ed.2d 1000 (1976), in discussing inventory searches, stated:
 "This Court has traditionally drawn a distinction between automobiles and homes or offices in relation to the Fourth Amendment. Although automobiles are `effects' and thus within the reach of the Fourth Amendment, Cady v. Dombrowski, 413 U.S. 433, 439, 93 S.Ct. 2523, 2527, 37 L.Ed.2d 706 (1973), warrantless examinations of automobiles have been upheld in circumstances in which a search of a home or office would not. Cardwell v. Lewis, 417 U.S. 583, 589, 94 S.Ct. 2464, 41 L.Ed.2d 325 (1974); Cady v. Dombrowski, 413 U.S., at 439-440, 93 S.Ct. at 2527; Chambers v. Maroney, 399 U.S. 42, 48, 90 S.Ct. 1975, 1979, 26 L.Ed.2d 419 (1970). "The reason for this well-settled distinction is twofold. First, the inherent mobility of automobiles creates circumstances of such exigency that, as a practical necessity, rigorous enforcement of the warrant requirement is impossible. Carroll v. United States, 267 U.S. 132, 153-154, 45 S.Ct. 280, 69 L.Ed. 543
(1925); Coolidge v. New Hampshire, 403 U.S. 443, 459-460, 91 S.Ct. 2022, 2034, 29 L.Ed.2d 564 (1971). But the Court has also upheld warrantless searches where no immediate danger was presented that the car would be removed from the jurisdiction. Chambers v. Maroney, 399 U.S., at 51-52, 90 S.Ct. at 1981; Cooper v. California, 386 U.S. 58, 87 S.Ct. 788, 17 L.Ed.2d 730 (1967). Besides the element of mobility, less rigorous warrant requirements govern because the expectation of privacy with respect to one's automobile is significantly less than that relating to one's home or office. In discharging their varied *Page 1018 
responsibilities for ensuring the public safety, law enforcement officials are necessarily brought into frequent contact with automobiles. Most of this contact is distinctly noncriminal in nature. Cady v. Dombrowski, supra, 413 U.S. at 442, 93 S.Ct. at 2528. Automobiles, unlike homes, are subjected to pervasive and continuing governmental regulation and controls, including periodic inspection and licensing requirements. As an everyday occurrence, police stop and examine vehicles when license plates or inspection stickers have expired, or if other violations, such as exhaust fumes or excessive noise, are noted, or if headlights or other safety equipment are not in proper working order.
 "The expectation of privacy as to autos is further diminished by the obviously public nature of automobile travel. Only two Terms ago, the Court noted:
 "`One has a lesser expectation of privacy in a motor vehicle because its function is transportation and it seldom serves as one's residence or as the repository of personal effects. A car has little capacity for escaping public scrutiny. It travels public thoroughfares where both its occupants and its contents are in plain view,' Cardwell v. Lewis, 417 U.S., at 590, 94 S.Ct. at 2469.
 "In the interests of public safety and as part of what the Court has called `community caretaking functions,' Cady v. Dombrowski, supra, 413 U.S. at 441, 93 S.Ct. at 2528, automobiles are frequently taken into police custody. Vehicle accidents present one such occasion. To permit the uninterrupted flow of traffic and in some circumstances to preserve evidence, disabled or damaged vehicles will often be removed from the highways or streets at the behest of police engaged solely in caretaking and traffic-control activities. Police will also frequently remove and impound automobiles which violate parking ordinances and which thereby jeopardize both the public safety and the efficient movement of vehicular traffic. The authority of police to seize and remove from the streets vehicles impeding traffic or threatening public safety and convenience is beyond challenge.
 "When vehicles are impounded, local police departments generally follow a routine practice of securing and inventorying the automobiles' contents. These procedures developed in response to three distinct needs: the protection of the owner's property while it remains in police custody, United States v. Mitchell, 458 F.2d 960, 961 (CA9 1972); the protection of the police against claims or disputes over lost or stolen property, United States v. Kelehar, 470 F.2d 176, 178 (CAS 1972); and the protection of the police from potential danger, Cooper v. California, 386 U.S., at 61-62, 87 S.Ct. at 790. The practice had been viewed as essential to respond to incidents of theft or vandalism. See Cabbier v. Commonwealth, 212 Va. 520, 184 S.E.2d 781, 782 (1971), cert. denied, 405 U.S. 1073, 92 S.Ct. 1501, 31 L.Ed.2d 807 (1972); Warrix v. State, 50 Wis.2d 368, 376, 184 N.W.2d 189, 194 (1971). In addition, police frequently attempt to determine whether a vehicle has been stolen and thereafter abandoned."
The Court points out in South Dakota v. Opperman, supra, that the caretaking procedures, above discussed, have always uniformly been upheld by state courts, which, because of traffic regulations and similar matters, have determined that such intrusions are reasonable and therefore constitutionally permissible. The authorities are listed in South Dakota v.Opperman, supra.
This Court is clear to the conclusion that the items seized by Trooper Sikes were in accordance with Ohio Troopers' regulations and were in all respects reasonable under the facts of the case at bar. The seizure of the sawed-off shotgun and the twelve-gauge shells, which were subsequently admitted in evidence at trial, was in all respects proper.
Moreover, Lippold and his companion, Patricia Gregg, being the occupants of a stolen pickup truck, lacked the necessary standing to object to the seizure of the sawed-off shotgun and shells found therein *Page 1019 
by Trooper Sikes. Hodges v. State, 48 Ala. App. 217,263 So.2d 518 (1972); Jones v. United States, 362 U.S. 257, 80 S.Ct. 725,4 L.Ed.2d 697 (1960); Bridges v. State, 52 Ala. App. 546,295 So.2d 266 (1974).
 II STATEMENTS TO INMATES
The appellant's counsel also challenges the admission into evidence at trial of certain statements of an inculpatory nature made by Russell Lippold to several persons while he was detained at the Juvenile Center in Anniston, Alabama, awaiting trial. In particular, appellant's counsel challenges Lippold's statement to Mark Wheeler, age 16; Beth Sizemore, age 13; and Rodney Works, age 15, which statements were made to the three individuals during the Fall of 1977 by Lippold while all of them were in the detention home in Anniston, Alabama. Counsel argues that the appellant had been sent there while his condition was being evaluated pursuant to Court Order, and that he was without the advice or presence of counsel when the challenged statements were made.
There is no suggestion in this record that such young people were placed surreptitiously in or about the whereabouts of Lippold for the purpose of obtaining inculpatory statements. The record in this cause is to the contrary. The three young people, each, indicated that they first met Lippold while they were at the Juvenile Center in Anniston during the Fall of 1977.
Mark Wheeler stated that he simply engaged Russell Lippold in conversation and inquired why he was being held there, to which Lippold replied, "Robbery and murder." He stated that Lippold then told of "robbing a gas station at a place called Collinsville, where he said he shot this man with a twelve-gauge shotgun and it was sawed-off and was somewhere between eight and twelve inches long, he used # 4 shot, and was approximately three feet away." He stated that Lippold told him that "he went in there with this lady, and they were in a pickup truck, that he asked the man for the money and he gave him approximately $130.00, that the man said, `Don't shoot,' but he shot the man in the right side with a shotgun."
Beth Sizemore stated that the first time she spoke with Lippold, he stated that he did not want to talk with her, but on a second occasion he told her he was charged with murder, that "he killed a man with a sawed-off shotgun, and that his girl friend had been with him."
Rodney Works stated that, during a conversation with Russell Lippold, after Lippold had been in Anniston for some two or three weeks, he stated that "he had just robbed a service station and killed a guy near Collinsville, that a girl was with him, and that he, Lippold, went into the service station and used a sawed-off shotgun."
We have carefully examined the three inculpatory statements attributed to Lippold, above described. While it is true they were made to fellow inmates at a Juvenile Center, none of these could be described as custodial interrogations, see Truex v.State, 282 Ala. 191, 210 So.2d 424, nor is there any suggestion that such inmates were endeavoring to inquire as to the details of the murder in question. Rather, the voluntariness of such statements was fully established at trial and were therefore not proscribed by Miranda v. Arizona, 384 U.S. 436,86 S.Ct. 1602, 16 L.Ed.2d 694, 10 A.L.R.3d 9470.
Also, such were properly admitted as "volunteered statements" of an inculpatory nature. They are similar to excited utterances made spontaneously at or near the scene of a given occurrence. See Bedingfield v. State, 47 Ala. App. 677,260 So.2d 408, and authorities cited therein.
 III STATEMENT TO PSYCHOLOGIST
At a hearing conducted prior to trial, at which the State of Alabama sought to transfer the proceeding from Juvenile Court back to the Circuit Court for trial. *Page 1020 
the State presented the testimony of Dr. Steven Bitgood, a doctor of philosophy, who was on the staff of the Coosa Valley Regional Juvenile Center, and who, pursuant to Court Order, interviewed the appellant, Russell Lippold, at the Center during October, 1977. Dr. Bitgood testified that his interviews with the appellant were for the purpose of evaluating Lippold's condition pursuant to the Court Order. The trial court had directed that Lippold be sent to this Center in Anniston, Alabama, for the purpose of psychiatric testing and observation. In the words of appellant's counsel, the appellant was "700 to 800 miles away from family or friends, and 80 miles and two counties away from his attorney."
Dr. Bitgood did inform Lippold that his statements could be used, and would be used, in a report made back to the Circuit Court, but the doctor admitted that he did not know whether Lippold fully understood the implications of his "Miranda" type warning. Without question, no counsel or relative was present during the discussion with Dr. Bitgood by Russell Lippold of the events, which included his activities in his home state of Michigan before he and Patricia Gregg left there and their thefts there and in other states before robbing the service station attendant near Collinsville, and the words of Patricia Gregg to Lippold, "Don't leave any witnesses," then Lippold's subsequent feeling of hostility toward her because of this.
Dr. Bitgood related that he diagnosed Lippold as "an antisocial personality," who had experienced difficulty with his family and other people, lacked a moral code, and had a history of irresponsible and selfish behavior. Further, Dr. Bitgood stated that Lippold did not appear to have anxiety or remorse over some of the things he had done in the past, and apparently had not benefited in efforts to rehabilitate him in Michigan (Volume II, R. 252, Report of Pretrial Evaluation).
Based upon Dr. Bitgood's findings, the trial court granted the State's Order to transfer the cause back to the Circuit Court for trial. This Order is dated December 28, 1977, and directs that Lippold be tried as an adult in the Circuit Court of DeKalb County.
At this same hearing, the Circuit Court also heard the testimony of Investigator Bethune, who told of statements made by Lippold while in the jail, "that he wanted to get an officer."
Counsel for the appellant challenges the use at the evaluation hearing of the statements to Dr. Bitgood because such evaluation, while done under court order, was made in the absence of counsel.
Appellant's counsel cites us to the provisions of § 12-15-67, Code of Alabama 1975, which reads as follows:
 "Use of statements of children, etc., during custody, preliminary inquiries, predisposition studies, etc., prior to determination of allegations of petition in delinquency or in need of supervision cases or prior to conviction in criminal proceedings.
 "Unless advised by counsel, the statements of a child or other information or evidence derived directly or indirectly from such statements made while in custody to police or law enforcement officers or made to the prosecutor or probation officer during the process of the case, including statements made during a preliminary inquiry, predisposition study, informal adjustment or consent decree, shall not be used prior to a determination of the petition's allegations in a delinquency or in need of supervision case or in a criminal proceeding prior to conviction. (Acts 1975, No. 1205, § 5-125.)"
The inculpatory statement related to Dr. Bitgood by Lippold, following a discussion, and the doctor's informal type advice that such statement could be used against him, involved the statement by Lippold that they had "stolen a shotgun and a vehicle, robbed a couple of places, and on the day of the murder, pulled into a service station, pulled *Page 1021 
the shotgun on the attendant, robbed him, and that Patricia Gregg had stated to him, `Don't leave any witnesses,' at which point Lippold pulled the trigger and shot the victim (Lester Gordon Mullins) in the side" (Volume II, R. 250).
Without question the appellant did not have counsel present at the time the statements were made to Dr. Bitgood.
Had the State of Alabama endeavored to use the statement made to Dr. Bitgood as substantive evidence on trial of this cause before the jury, we would not hesitate to reverse and remand this cause for a new trial, pursuant to the provisions of § 12-15-67, Code of Alabama 1975, above quoted. See also Watts v.State, Ala.Cr.App., 361 So.2d 1200 (1978).
The record in this cause is clear, however, that the Statedid not use Lippold's inculpatory statements to Dr. Bitgood as evidence on trial.
Rather, these matters were brought out at the evaluation hearing as to whether or not the appellant's cause should be transferred to the Circuit Court of DeKalb County for trial.
We are of the opinion that this matter was properly handled by the Circuit Court, and that the requirements of Breed v.Jones, 421 U.S. 519, 95 S.Ct. 1779, 44 L.Ed.2d 346 (1975), and authorities therein cited were here carefully observed.
 IV CLOSING ARGUMENT
Finally, appellant's counsel contends that the district attorney's remark during closing argument to the effect, "If you do not convict this defendant, he will be responsible for more murders or crimes," is grounds for reversal.
Immediately following this comment by the district attorney, the record reflects the following admonition and instructions by the trial judge (Volume I, R. 158-159):
 "THE COURT: I'm going to deny the motion for a mistrial. Ladies and gentlemen of the jury, I am going to instruct you to disregard the comment of the District Attorney in that regard. The comments of the District Attorney and the defense counsel, once he argues to you, are not evidence in the case. They are not to be considered by you as evidence. They can argue the evidence and they can argue reasonable inferences to be drawn from the evidence, but I'm going to instruct you to disregard the comment of the District Attorney in regard to any future activity on the part of this defendant. Put that matter outside of your mind and do not consider it as a part of your deliberation in this case. You may proceed.
 "MR. MAUNEY: Your Honor, would you ask the jurors if they can disregard that?
 "THE COURT: Is there any juror who feels that he or she would have trouble or find it impossible to comply with the Court's instructions in this regard?
"(No response.)
"You may proceed.
 "(Whereupon, Mr. Mauney continued his argument to the jury, followed by Mr. Scruggs on behalf of the defendant, and followed by Mr. Igou on behalf of the state.)"
In reviewing the colloquy above quoted, it is clear that the trial judge immediately instructed the jury that such statement was argument and not to be regarded as evidence on trial. The trial judge then inquired of the jury if there was anyone who could not obey his instructions, to which there was no reply.
In light of the trial judge's prompt and emphatic instructions to the jury, we are clear to the conclusion that no error resulted in overruling the motion for mistrial. Shadlev. State, 280 Ala. 379, 194 So.2d 538; Adair v. State,51 Ala. App. 651, 288 So.2d 187; Retowsky v. State, Ala.Cr.App.,333 So.2d 193; Earley v. State, Ala.Cr.App., 358 So.2d 494, cert. denied, *Page 1022 358 So.2d 501 (1978), and authorities therein cited.
We have carefully examined this record, as required by law, and find no error therein. The judgment is therefore
AFFIRMED.