Appellant was indicted and tried for murder in the first degree of Virgil Satterfield. A jury found him guilty of murder in the second degree and fixed his punishment at twelve years imprisonment. He was sentenced accordingly.
According to the undisputed and unquestioned evidence, Virgil Satterfield was placed in jail at Ider, Alabama, at 3:30 P.M.[1]
on the afternoon of December 5, 1978. No charges were placed against him; police officers had found that he was intoxicated and placed him in jail to sober up. He remained in jail until 8:00 P.M. December 5 when the defendant, with whom Mr. Satterfield had been working, came to the jail, and Satterfield was released in defendant's custody. The two remained there awhile visiting with the radio operator and then left for defendant's home in Cartersville *Page 1199 
approximately five miles from Ider. The undisputed and unquestioned evidence also shows that before about 11:15 o'clock the same night Satterfield, who was called also by the first name of "Berthal," had been shot and killed and his body found in bed at the home of the defendant. He had been killed by shots from .410 gauge shotgun shells. There was strong undisputed expert testimony that they were fired from a .410 gauge shotgun owned by defendant.
Defendant was living alone at the time. He had been married to Carrie Ann Kelley, but they had been divorced in March 1978, and she was living at the time in the vicinity of Chickamauga, Georgia, a distance of some thirty to forty miles from the home of defendant. Mr. Milton Kelley, a grown son of Mrs. Kelley by her first marriage, lived in the vicinity of his mother.
Undisputed and unquestioned evidence further shows that about 11:15 P.M. defendant drove to his home in his truck and about five minutes thereafter he went to the home of his neighbors, Mr. and Mrs. Cleve Blevins, who lived just across the road from defendant, informed them that someone had killed Virgil Satterfield, and asked them to return to his home and see. Before doing so they called law enforcement officers and neighbors who assembled at defendant's home and found Satterfield's body as hereinbefore stated.
No witness, other than defendant, testified that he heard or saw Satterfield during the period of approximately three hours between the time he left the Ider jail with defendant and the time he was seen dead in defendant's bed. Evidence as to what defendant did during that three-hour period was furnished largely by defendant, defendant's ex-wife Mrs. Kelley, Mrs. Kelley's son, Milton Kelley, and partly by Mr. and Mrs. Blevins.
Although not in the order of the evidence presented on the trial, we first summarize the testimony of defendant as to what happened during the three-hour period. He said that promptly after leaving the jail with Satterfield, they went to defendant's home where Satterfield requested and obtained a drink. Defendant said that he then went outside to do some work, that before he could return to his home he was approached from the rear and ordered to stand up against a building and drop some shells he had and a gun, the .410 gauge shotgun previously mentioned, which he did. He testified further that he only saw one person but heard two; one was masked and forced defendant into his truck and at gunpoint to drive him over the Georgia line toward LaFayette, Georgia. According to his testimony, another car approached from behind and blinked its lights, and he was ordered to stop. He then heard something, which later turned out to be his .410 gauge shotgun, being thrown into the rear of the truck, and he was told, "Keep your damn mouth shut or you'll go like your buddy." He was then left alone and proceeded to the nearby home of his ex-wife, who would not let him in her house. He told her that he was afraid that "Berthal" [Mr. Satterfield] might have been killed. She refused to let him use the telephone, but she called her son Milton who came over. He said he told Milton that he was afraid "a man had been killed." He left the premises when Mr. Kelley told him to "get the hell off the hill." Defendant denied that he killed Satterfield. He also claimed that he had drunk a lot of liquor, and his memory was not good as to all that had occurred.
Mrs. Kelley testified that when defendant came to her house he told her that he had killed a man, that "he shot Berthal over there in his bed." He also told her at the time that "I set the gun over the fence."
Milton Kelley testified that defendant told him that "he had killed a man," that defendant said nothing about anyone kidnapping him or abducting him.
Mr. and Mrs. Blevins testified when he came to their house he told them that someone had broken into his house and killed Berthal. She said:
 "He [defendant] said, `Get up and help him. I left Berthal over there to go to bed and had to go to town, and when I come back somebody had killed him on my bed in my house.'" *Page 1200 
According to the testimony of Mr. and Mrs. Blevins, defendant said nothing to them that night about being kidnapped or abducted, nothing about any masked men.
There was testimony by law enforcement officers that about 3:15 A.M. the night of the death of Satterfield, defendant made a voluntary statement after he had been fully advised as to his rights that he and Satterfield came from the Ider jail to defendant's home, that defendant stayed there about thirty minutes then left Satterfield at defendant's home and went to his sister's house at East Ridge or Chattanooga. He said his sister was not at home and he returned to his residence, unlocked his gate and went into the house where he saw Satterfield's body when he turned on the light. He said he did not know where his .410 gauge shotgun was at the time. He also said he had not seen his ex-wife in several weeks. There was further testimony that at 11:00 A.M. after the killing, defendant notified one of the officers that he wanted to change his story. He then gave an account of what happened that night substantially in accordance with his testimony on the trial.
Appellant insists that the trial court erred in several instances in ruling that circumstantial evidence that might have tended to show that someone other than defendant killed Satterfield was not admissible. He relies largely on extracts from Gamble, McElroy's Alabama Evidence § 48.01 (1)(6)(7) (1977). In § 48.01 (1) it is stated:
 "It is held, secondly, that the accused can only introduce evidence of another's guilt when the state's case against the accused is a circumstantial one. There are judicial statements to the effect that, when a case is one of circumstantial evidence, testimony may permissibly take a wide range and, to rebut such evidence, the defendant has the right to introduce any legal evidence tending to show that someone else may have been guilty in exoneration of himself."
Laying aside any issue between the parties on appeal as to whether the evidence against defendant was entirely circumstantial, we now give consideration to the contention of appellant as to the several occasions that he argues constituted a refusal by the trial court to permit defendant to show that other persons had motive and opportunity to commit the crime.
One of the instances of which appellant complains is found during his cross-examination of Mrs. Blevins as follows:
 "Q. And was Connie Rogers the man that Mr. Satterfield had shot about a year ago?
 "A. Yes, sir. I don't know whether it was a year ago or not, but they said Satterfield killed Rogers.
 "MR. IGOU: Judge, we object to that. He was found not guilty. He was acquitted of it. Move to strike it and ask the jury to disregard it.
"THE COURT: Sustain the objection. Go ahead.
"MR. WATSON: We except."
The substance of the answer of the witness was clearly hearsay. The court was not in error in holding that it was not proper evidence. Thereafter defendant sought to show by the same witness that it was "common belief in that community" that Rogers had been killed by Satterfield. The State's objection to such testimony was properly sustained. Testimony of a witness as to what others believed is not admissible. Shadle v. State,280 Ala. 379, 383, 194 So.2d 538 (1967).
Defendant attempted to show the bad reputation of three persons living in the community where Satterfield was found dead in his effort to show that perhaps one or more of them had killed Satterfield. The court sustained the State's objection to questions asking whether a witness knew the reputation of such persons. The testimony was not admissible in evidence.Toliver v. State, 142 Ala. 3, 38 So. 801 (1905).
 "It appears quite clear that an accused cannot prove the character of another in the community where he lives for the purpose of showing that such other, and not the accused, committed the crime being *Page 1201 
prosecuted. . . ." Gamble, McElroy's Alabama Evidence, § 48.01 (10) (1977)
Defendant directed some questions to witnesses as to what they had heard Mr. Satterfield say as to what others had done or threatened to do to him. The court sustained the State's objections to such questions, two of which are shown in the following part of defendant's cross-examination of Mr. Blevins:
 "Q. I'll ask you if it wasn't a fact that Mr. Satterfield had come in there and told you he had been beaten up by the Weldons?
"MR. IGOU: Judge, we object to that.
"THE COURT: I'll sustain the objection.
 "MR. WATSON: We reserve the right to make an offer of proof and except to the ruling of the Court.
 "Q. I'll ask you if Mr. Satterfield hadn't communicated to you he had a continuous problem with them before. . . .
 "MR. IGOU: Judge, we object to this. Just a minute, please sir.
"MR. WATSON: I want to finish my question.
"THE COURT: Approach the bench.
 "Gentlemen, I'm not going to allow you to ask questions about statements that the dead man might have made to this witness. It would be inadmissible."
Appellant cites no authority to show that in a homicide case the defendant should be allowed to prove that the deceased, before the injury causing his death, had made statements as to what others had done or said in the way of acts or threats of violence against him. In Goodlett v. The State, 136 Ala. 39,44, 33 So. 892, 894 (1902) it was held:
 "The evidence offered by defendant of the declarations of the deceased that Simon Crook had threatened her life was the barest hearsay and inadmissible. Had Simon admitted to the witness that he committed the homicide, his admission or confession would have been incompetent. West v. The State, 76 Ala. 98; Snow v. The State, 58 Ala. 372. The fact that the evidence offered was a declaration of the deceased to the witness instead of a statement by Simon to the witness, does not relieve it from being hearsay. Tatum v. The State, 131 Ala. 32, 31 So. 369."
Defendant was allowed to show in his cross-examination of Mrs. Blevins that to the best of her knowledge there had been no hard feelings between defendant and deceased. Immediately after she had so testified, defendant made his first effort to show that Satterfield could have been killed by someone other than defendant. Counsel for defendant had stated to the jury in his opening remarks that he thought there would "be some testimony that Mr. Satterfield was tried about a year ago for shooting and killing a Mr. Connie Rogers, who also lived in the community, and that there was some bad feeling in the community toward Mr. Satterfield." The State objected to such statement, and after counsel for defendant had stated that he expected to show that other people in that community had the opportunity and the motive to kill Satterfield, the court overruled the State's objection to the statement. The ruling of the court on the matter of the first attempt by defendant to introduce evidence showing a relationship between Satterfield and other people of the community is in the record as follows:
 "Q. Do you know if Mr. Satterfield had had hard feelings with any other family in the community?
 "MR. IGOU: Judge, we object to this. They are trying to raise something they can't show through the evidence.
"MR. WATSON: Her answer would be . . .
"MR. IGOU: We object to it.
"MR. WATSON: We think we are entitled to . . .
"MR. IGOU: Object to the form of the question.
"MR. WATSON: Do I get to talk, Mr. Igou?
"MR. IGOU: Yes sir, when I make my objection.
 "THE COURT: All right, gentlemen, I am going to sustain the objection. *Page 1202 
"MR. WATSON: We except."
Whether the court was in error in sustaining defendant's objection as shown above is a question very close to some which have been resolved in favor of the party asking the question.Wallis v. State, 51 Ala. App. 499, 286 So.2d 909, cert. denied,291 Ala. 801, 286 So.2d 912 (1973); Peinhardt v. State,37 Ala. App. 693, 76 So.2d 176, cert. denied, 262 Ala. 10,76 So.2d 179 (1954); Bennefield v. State, 134 Ala. 157, 32 So. 717
(1901); Lodge v. State, 122 Ala. 97, 26 So. 210 (1898); Polk v.State, 62 Ala. 237 (1878). In the cited cases, the trial court was reversed for not allowing defendant to show by a witness ill will or hard feelings by another or others (between two others in Wallis and Peinhardt; between the witness and the accused in Polk; and between the parent of a minor witness and the accused in Lodge and Bennefield). Assuming that they would be precedents for holding that defendant should have been allowed to show that there were hard feelings between Satterfield and other residents of the community or on the part of other residents of the community toward Satterfield, we find nothing in the cases cited that would necessarily support the conclusion that evidence that Satterfield "had had hard feelings with any other family in the community" would be admissible in evidence. We realize that defendant's counsel may well have meant hard feelings between Satterfield and some other family in the community or hard feelings upon the part of some other family in the community toward Satterfield, but he did not say so. The question asked is distinguishable from the question asked in each of the cited cases. We do not say that it would have been appropriate for the court to have given defendant's counsel an opportunity to clarify the question so as to make it come within the rationale of what was held in the cases cited, but its failure to do so does not constitute reversible error.
The record shows that considerable range was allowed defendant in developing his theory that someone other than the defendant may have killed Mr. Satterfield. Numerous objections were made by the State to questions by defendant in developing the particular theory. About as many were overruled as were sustained by the court. Perhaps in no part of the field of evidence is the line of demarkation between that which is admissible and that which is inadmissible more difficult to determine than in the area under consideration, which is captioned by Judge McElroy as "Proof by Accused that Another Person Committed the Crime," and as to which he states:
 "A careful analysis of all the pertinent decisions will reveal that the true test of whether evidence of another's guilt is admissible lies within the sound discretion of the trial judge." Gamble, McElroy's Alabama Evidence, § 48.08 (1) (1977)
The trial court was not in error in sustaining the State's objection to the question, "Do you know if Mr. Satterfield had had hard feelings with any other family in the community?"
There was some testimony by Mrs. Blevins that about 10:30 the night of the homicide she received a telephone call from Mrs. Kelley. There was also testimony by Mrs. Kelley that she made such telephone call to Mrs. Blevins soon after defendant had left the home of Mrs. Kelley. Mrs. Blevins testified before Mrs. Kelley as to such conversation. At that time it appears that defendant objected to the contents of the telephone conversation between the two, and the court at first sustained defendant's objection to such conversation. Thereafter the record indicates that the trial court had made it known to the attorneys for both sides that it would allow the State to show by Mrs. Blevins what she told Mrs. Kelley and to show by Mrs. Kelley what she said to Mrs. Blevins in the particular conversation, and each was allowed to testify as to what she said but not as to what the other said in the conversation.
Mrs. Blevins testified that in response to a question by Mrs. Kelley she said to Mrs. Kelley, "I hadn't heard anything or seen anything. It's no lights on over there. His truck's not over there, or the Satterfield's car is not over there." The witness further *Page 1203 
said that she looked across the road at defendant's house at the time of the telephone conversation, and what she told Mrs. Kelley was what she observed or did not observe at the time. Mrs. Kelley testified that in the particular telephone conversation, "I asked her had there been any shooting going on out there."
The parties on appeal do not address the question whether the content of the telephone conversation between the two witnesses falls within the spontaneous exclamation or res gestae
exception to the hearsay rule as comprehensively considered in Gamble, McElroy's Alabama Evidence, § 265.01 (1977). For that reason and the further reason that no injury was caused defendant by the admission of such testimony, we forego a determination of the question.
Under the undisputed and unquestioned evidence someone had killed Satterfield. The cardinal issue of fact was whether defendant had killed him. The substance of the content of the telephone conversation was that neighbors across the road from where the body of Satterfield was found heard no shots fired during the period of time in which the killing occurred, and that they observed no activity at defendant's home for approximately the last forty-five minutes of the period of time in which Satterfield was killed. This evidence points neither to the corpus delicti nor to defendant as the killer. Furthermore, the facts indicated by such evidence were conclusively and unquestionably established by the direct testimony of both Mr. and Mrs. Blevins as to all of that which they actually saw and to what they did not hear.
Some photographs of deceased's body and of the room in which his body was found were admitted in evidence over the objection of defendant on the ground that they were offered solely for the purpose of inflaming the minds of the jury and prejudicing the jury against defendant. We see nothing about the pictures that tend to support such ground of objection. The photographs as to the scene tended to lead the jury to a better understanding of the entire surroundings and were admissible for that purpose. Douglas v. State, 50 Ala. App. 602,281 So.2d 652 (1973). The photographs of the body tended to corroborate and illustrate the testimony of the toxicologist as to the number and location of the wounds. For such purpose they were admissible. Palmore v. State, 283 Ala. 501, 218 So.2d 830
(1969). There is nothing about the pictures that is more gruesome than the facts otherwise shown as to how Satterfield was killed, nor do the pictures tend to exaggerate the nature and extent of the fatal wounds as otherwise shown. Notwithstanding their gruesomeness, the photographs were properly admitted in evidence. Palmore, supra; Douglas, supra;Braswell v. State, Ala.Cr.App., 371 So.2d 992 (1979); Turk v.State, Ala.Cr.App., 347 So.2d 588 (1977).
We find no error in the record and the judgment of the trial court should be affirmed.
The foregoing opinion was prepared by Retired Circuit Judge LEIGH M. CLARK, serving as a judge of this Court under the provisions of § 6.10 of the Judicial Article (Constitutional Amendment No. 328); his opinion is hereby adopted as that of the Court. The judgment of the trial court is hereby
AFFIRMED.
All the Judges concur.
[1] Central Standard Time. All of the incidents in the evidence were close to the line dividing the Central time zone from the Eastern time zone, which tends to result in some confusion as to the exact time of some incidents. To avoid confusion, we will state the time as Central Standard Time in each instance where time is given in this opinion, which will require an adjustment to Central Time of testimony of witnesses who calculated time in terms of Eastern Time.