TYSON, Judge.
Hamlin Bee Mitchell was indicted and convicted for the offense of burglary in connection with the nighttime breaking and entering of an uninhabited dwelling house owned by one Jeff Newton. § 13-2-41, Code of Alabama 1975. He was sentenced by the court to serve eight years in the state penitentiary, and now brings this appeal contending that the trial court committed several reversible errors.
The record of the proceedings below indicates that, before the commencement of appellant’s trial, his counsel filed a demurrer to the indictment, which was overruled, and two motions to suppress certain evidence, one being directed specifically to certain “statements” allegedly made by appellant to the police, and the other concerning “all tangible items of property” gathered as a result of appellant’s arrest. The basis for these motions was apparently that appellant had been arrested illegally, and the trial court deferred hearing and ruling on the motions until the disputed evidence was to be admitted during the trial.
The first witness for the State was Jeff Newton, a resklent of Opelika, who stated that, on December 3, 1979, he had left his house, located off Highway 29, around 10:00 o’clock that morning after first closing all of the windows and closing and locking the front and back doors to the house. Mr. Newton testified that he and his roommate, Terry Nelson, returned to the house between 10:30 and 11:00 that night, and that, upon driving down the driveway to the house, they noticed “a strange car” parked at the house. Mr. Newton stated that he then noticed his Pioneer and Jensen brand stereo equipment, normally kept inside the house, resting on the front porch, so he parked his car in such a position so as to prevent the other car from leaving. The witness further testified that he then saw that the front door to the house was open, and decided at that point to look at the second car’s license plate, which displayed a Montgomery number, remove the keys from the car, and further remove the car’s distributor cap “and stuff off of it” to prevent the subsequent starting of the engine. During this sequence of events, he did not see anyone on either the floor or seats of the car. Mr. Newton and his roommate then left and summoned the police. The witness further stated that, during the course of the subsequent police investigation, an officer gave him a “45” adapter, a small plastic item used on stereo equipment to play “45” records, and that this adapter had previously been in the house. Mr. *172 Newton also testified that, after the arrival of the police, he had occasion to see the appellant, who was his “ex-wife’s uncle,” at the scene.
Under cross-examination by counsel for appellant, Mr. Newton testified that he only knew appellant “ ‘cause he was kin to my wife” (R. 19), but had not previously socialized with him, although appellant had been to the Newton house before. He also stated that, while he had been searching for the keys in the second car, he had not seen anyone in or around the house, and it was “possible” that appellant could have been sleeping on the back seat of the ear.
Mr. Newton stated on re-direct examination that he did not notice anyone in the car, and in his opinion there had been sufficient light from a nearby outside light fixture to have enabled him to see anyone in the car.
Robert W. Meadows, a patrolman for the Opelika City Police Department, testified that, on the night of December 3, 1979, he and his partner, Officer Reeves, had been summoned with another “back-up” police unit to Jeff Newton’s residence. Upon arrival, they were met by Mr. Newton at the point where Highway 29 intersects the dirt driveway to the Newton residence, and Newton was then directed to remain at the highway until the officers had investigated what Newton had related to them. Officer Meadows stated that, upon driving down the driveway, he saw a brown Plymouth Valiant automobile near the house and observed appellant “standing in the doorway with a foot on the ground and a foot in the car” (R. 28). Officer Meadows further testified that appellant was standing on the driver’s side of the car, and that the car displayed a Montgomery license plate. The officer also stated that he noticed the front door of the house to be open and several items of stereo equipment resting on the front porch, and at that point “read the defendant his constitutional rights” (R. 30). A subsequent examination of the house revealed that the back door was standing open as well, and there were “pry marks” apparently made by “some sharp type instrument” (R. 33) around the door’s latch. In the interior of the house, the furniture was in disarray and several rooms had been “ransacked.” Officer Meadows further testified that he also had occasion to look into appellant’s car as he was handcuffing appellant.
On examination outside the presence of the jury by counsel for appellant, Officer Meadows stated that he arrested appellant for “public drunkenness” in that he had determined during his reading of the appellant’s rights that appellant was “intoxicated.” The officer testified that he seemed coherent but was intoxicated and “suffering from some type of injury” (R. 38), identified to be a broken collarbone, and thus the officer “didn’t want him walking around and we didn’t want to let him go from the scene” (R. 38). Further, Officer Meadows stated, “he was in no condition to drive or walk around and he was placed under arrest ... because I thought he was a danger to himself at that time” (R. 38). The officer also stated that appellant was in a “public place” in that he was not inside a car or private residence, but that appellant was on private property, and that at any rate the arrest had been made under the provisions of the Opelika City Code and not the state law. Officer Meadows also stated that appellant “was unsteady on his feet, and belligerent ... was using profane language [and] [y]ou could smell an odor of alcoholic beverage about his person; he reeked of it” (R. 39). Appellant was handcuffed at this point, but not charged with burglary, because the officer's were not certain as to what exactly had occurred. Officer Meadows stated that, while in the process of handcuffing appellant, he glanced into appellant’s car through its open door and saw a knife on the passenger’s side of the front seat, and further examined the area around the car, thereby finding the “45” plastic adapter on the ground behind the trunk. The knife and adapter were pointed out by the officer to another detective, but the officer stated that he did not personally secure the items.
*173 Officer Meadows further testified during this hearing that he questioned appellant about the burglary after again advising him of his rights, which appellant claimed to understand, and at that point appellant denied burglarizing the house, but claimed that he had only come to visit relatives. According to the officer, appellant stated that he had gone to the front door, knocked and when no one responded he started to leave, only then noticing the stereo equipment on the front porch. Appellant returned to his car, could not start it, and subsequently fell asleep on the front seat. Officer Meadows further testified that he was not present when appellant gave any written statement. He also stated that he had advised appellant of his Miranda[1] rights at least three times, and had advised him that he was being investigated on the burglary charge. According to officer Meadows, appellant acknowledged his rights and seemed coherent. Appellant was charged with the burglary some three days later, and was also subsequently convicted on the drunkenness charge.
The examination of Officer Meadows was then resumed in the presence of the jury, and the officer testified as to a number of the points raised in the hearing outside the jury’s presence. No testimony was adduced as to any statements, oral or written, that were allegedly made by appellant.
On cross-examination, the officer testified that, to his knowledge, he was uncertain as to when appellant was actually charged with the burglary. He further stated that the nature of the “pry marks” on the back door to the Newton house indicated to him that the marks were very recent, but that he had not found any tools or implements on appellant’s person which might have made the marks, except the knife in appellant’s car.
The State rested its case at that point, and the appellant’s motion to exclude the State’s evidence for failure to prove a pri-ma facie case, and for the prejudicial admission of the knife was overruled. The only witness called by appellant was Edna B. Wiggins, who testified that she was a friend of appellant and had seen him on the night of December 3 around 9:00 o’clock at her residence. According to this witness, appellant did not drink in her presence and did not appear intoxicated. She stated that he stayed at her residence for about two hours and then left, and she was not aware of where he went afterwards.
I
Appellant initially contends that he was illegally arrested on the “drunkenness”. charge at the scene of the burglary in that the circumstances did not justify his arrest on that charge under the terms of the applicable statute, and thus the trial court committed reversible error in apparently overruling the two motions to suppress submitted by appellant at trial. While, admittedly, evidence gathered as the result of an illegal arrest or detention is tainted by the prior illegality and may not therefore be constitutionally produced against a defendant, unless the primary “taint” is negated, Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963); Davis v. Mississippi, 394 U.S. 721, 89 S.Ct. 1394, 22 L.Ed.2d 676 (1969); Brown v. Illinois, 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975); and Dunaway v. New York, 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979), we are somewhat unclear as to exactly what evidence appellant claims should have been suppressed in the first place. Our review of the record only reveals that, though there was some testimony outside the presence of the jury as to possibly incriminating statements made by appellant at some point after his arrest, these statements were clearly not submitted to the jury for their consideration in determining the guilt or innocence of the appellant. Similarly, Officer Meadows was apparently permitted to testify as to a knife that he had seen on the front seat of appellant’s parked car at the time appellant had been handcuffed outside the car, but such testimony could not be said to have been *174 the product of appellant’s allegedly illegal arrest since the knife was in open view- on the seat. While the thrust of this line of argument is somewhat hazy, we have considered the contentions of appellant in regard to his arrest and find them to be without merit.
The arrest of appellant on the “drunkenness” charge was concededly effected without a warrant, but we find it clear that a police officer has the statutory authority to arrest a person without the requirement of a warrant for “any public offense committed or breach of the peace threatened in his presence,” § 15-10-3, Code of Alabama 1975, and this authority only sanctions a warrantless arrest for a misdemeanor or violation of a city ordinance committed in the presence of the officer. Green v. State, 238 Ala. 143, 189 So. 763 (1939); Coursey v. City of Andalusia, 24 Ala.App. 247, 134 So. 671 (1931). According to the testimony of Officer Meadows, he specifically arrested appellant under the provisions of the Opelika “disorderly conduct” ordinance, and not the state code section governing the offense of intoxication, though a reading of these two provisions reveals that there is essentially no difference between the two. The Opelika, Alabama, Code, § 17-7 states:
“Any person who disturbs the peace of others by violent, offensive or boisterous conduct or carriage, or by loud or unusual noises or by profane, obscene or offensive language, calculated to provoke a breach of the peace, or who shall while drunk or in a state of intoxication, appear in any public place wherein one or more persons are present, or at or within the curtilage of any private residence not his own, where one or more persons are present, and manifests a drunken condition by boisterous or indecent conduct, or loud and profane discourse, shall be deemed guilty of disorderly conduct, and shall be punished therefor.” [Emphasis supplied]
By comparison, § 13-6-14, Code of Alabama 1975, sets forth the offense of intoxication:
“Any person who, while intoxicated or drunk, appears in any public place where one or more persons are present, or at or within the curtilage of any private residence not his own, where one or more persons are present, and manifests a drunken condition by boisterous or indecent conduct or loud or profane discourse shall, on conviction, be fined not less than $5.00 nor more than $100.00, to be paid in money only.”
In Tatum v. State, 32 Ala.App. 128, 22 So.2d 350 (1945), the Court of Appeals, in construing the latter provision, stated the elements of the offense required to be shown by the evidence:
“The mandate of the statute prohibiting public drunkenness requires proof that the alleged offender, while intoxicated, appeared in a public place, or at or within the curtilage of a private residence not his own, where one or more people were present and manifested his or her drunken condition by boisterous, or indecent conduct, or loud or profane discourse.”
See, also, Huckabee v. State, 34 Ala.App. 288, 39 So.2d 43 (1949); Thompson v. State, 34 Ala.App. 608, 42 So.2d 640 (1949). In Thompson, supra, it was stated:
“A mere ‘staggering’ by a drunken accused is not sufficient to establish this offense in the absence of one or more of the elements above enumerated manifesting his drunken condition, that is evidence that the accused was boisterous or indecent in his conduct, or loud and profane.”
Our review of the evidence convinces us that the State demonstrated a prima facie case against appellant of violation of either the Opelika ordinance, or the state statute. See Cassell v. State, 55 Ala.App. 502, 317 So.2d 348 (1975). That appellant was intoxicated is almost undisputed (although the defense introduced an apparent alibi witness who claimed he was not when she saw him earlier that evening), in that “he was unsteady on his feet [and] you could smell an odor of alcoholic beverage about his person; he reeked of it” (R. 39). Officer Meadows testified that appellant *175 “was in no condition to drive or walk around” and “I thought he was a danger to himself” (R. 38). The same officer further stated that appellant was “belligerent” and “using profane language” (R. 39). And it is clear that, besides Officer Meadows, there were three other Opelika police officers present (R. 49). Cf., Moon v. State, 48 Ala.App. 127, 262 So.2d 615 (1972).
Appellant contends, however, that it was not shown that he was in a “public place” while acting in the manner the officer described, and therefore he could not be guilty of public drunkenness under the ordinance (or, for that matter, the state statute, since the wording is practically identical). While the exact geographical lay-out of the Newton house, and its relation to the public road, Highway 29, is unclear from the record (we only know that the house was back away from that road), it is apparent that appellant’s argument ignores that language of the respective provisions that proscribes such conduct “within the curtilage of any private residence not his own.” It is, of course, undisputed that appellant was apprehended at the residence of Jeff Newton, and it is thus immaterial under the terms of either the ordinance or the state statute that appellant was arguably not in a “public place.” Of the decisions cited by appellant, Franklin v. State, 91 Ala. 23, 8 So. 678 (1891), and Lee v. State, 136 Ala. 31, 33 So. 894 (1903), deal with a differently worded gaming statute (§ 13-7-20, Code of Alabama 1975), and are thus clearly inapposite. Warren v. City of Auburn, Ala., 337 So.2d 1319 (1976), dealt with a local ordinance forbidding the consumption of alcoholic beverages in “public place[s],” and under its facts, we do not see that that decision has any application here.
Appellant further argues that he was not permitted a sufficient opportunity to argue at the trial level concerning either his motions to suppress or the “constitutionality” of the Opelika ordinance. We have reviewed the record and find these contentions wholly without substance; additionally, we are not informed as to how or why the particular ordinance might be unconstitutional. We hold that the State carried its burden of demonstrating that the arrest of appellant at the scene on the drunkenness charge was proper and legal.
II
A somewhat similar contention of appellant is that if he was intoxicated so as to have been arrested on that charge, he could not have then voluntarily, knowingly and intelligently waived his Fifth Amendment rights. Again, we are at a loss as to exactly what self-incrimination the appellant is here complaining about, in that there was no testimony produced before the jury which related to any “incriminating statements” allegedly made by appellant to the police after his arrest on the drunkenness charge.
“The law is well settled that intoxication short of mania or such an impairment of the will and mind as to make a person confessing unconscious of the meaning of his words, will not render a confession inadmissible. The existence of intoxication which would affect the voluntariness of a confession is primarily a question of fact which is first addressed to the trial judge to determine the admissibility and later to the jury for whatever consideration it may deem appropriate.”
Jackson v. State, Ala.Cr.App., 375 So.2d 558 (1979); Rogers v. State, Ala.Cr.App., 365 So.2d 322, cert. denied, Ala., 365 So.2d 334 (1978); Medders v. State, Ala.Cr.App., 342 So.2d 49 (1977); Scott v. State, Ala.Cr.App., 333 So.2d 619 (1976). Although we do not see how appellant can complain under these circumstances of any waiver irregularities, we find from the record that in line with the above-cited authorities, there was no “mania” or other such conduct indicating that the degree of appellant’s intoxication was such as to cloud his ability to understand his rights, or be unaware of the events which occurred on this date.
III
Appellant complains that the trial court committed reversible error in failing to grant his motion for a mistrial because of *176 the introduction into evidence, and the subsequent withdrawal therefrom by the court, of a knife which had been removed from appellant’s car. It appears from the testimony that Officer Meadows, during the course of his investigation at the Newton house, discovered some “pry marks” on the back door of the house, and judged them to have been made by “some sharp type instrument” (R. 33). Under questioning outside the presence of the jury, Meadows testified that, while in the process of arresting appellant at appellant’s car, he had seen a knife “on the passenger’s side of the front seat” (R. 40) through the open door of the car, but had not retrieved it, instead only pointing it out to a detective. The State prosecutor acknowledged to defense counsel and the trial court that the State was not going to seek to introduce this knife into evidence. In the presence of the jury, however, the State resumed inquiries about the knife and succeeded in introducing it into evidence over the objection of counsel for the appellant. Subsequently, the following occurred:
“THE COURT: Mr. Meadows, when did you get that knife?
“A. Your Honor, when I first saw it, I pointed it out to another officer and by this time, if I’m not mistaken, Detective Holley was already summoned to the scene and when he arrived I pointed it out to him. And I was ordered by him to transport the prisoner, which I did. To my knowledge, the vehicle was towed in, because of its engine being partially taken apart. At the Police Department the next day the defendant gave a waiver to Lieutenant Gary Knight to search his vehicle. At that time, this in plain view, was taken from the vehicle as a result of that search.
“MR. LANE: I’m going to object to that, Judge. Now, that’s—
“THE COURT: I sustain the objection. I remove that from evidence, ladies and gentlemen of the jury.
“Is there anybody that can’t disabuse that fact from your mind, that you have seen this knife?
“Is there anybody that feels like you could not, you know, base your verdict on the other evidence, whatever it might be, and not consider the knife?
“If there is anybody on the jury that so feels, would you please raise your hand? “Okay. No one says they would.
“So, you take the knife and put it back into the envelope.
“MR. LANE: I move for a mistrial on the grounds that it was prejudicial and inflammatory and it’s like ringing a bell. You can’t unring a bell.
“MR. WILKES: Judge, he testified that appeared to be the same knife he saw—
“THE COURT: I know, but we had a hearing—
“MR. LANE: We had a hearing—
“THE COURT: —and I asked you that question ahead of time, what you planned to do with that knife and that didn’t come up, so put it back in the envelope and let’s go.
“MR. LANE: I renew my grounds for a mistrial because it was prejudicial and inflammatory.
“MR. WILKES: That’s all.
“THE COURT: Any other questions of Officer Meadows?
“MR. LANE: No sir, but do you overrule my motion?
“THE COURT: I did. Let’s go.
“MR. LANE: No further questions.” (R. 62-64) '
Evidently, the court felt that the State had failed to establish the proper “chain of custody” predicate for allowing the admissibility of the actual knife, but it appears that Officer Meadows was allowed to testify concerning his view of the knife on the seat of the car at the time he arrested appellant.
It is constitutionally prescribed in Alabama that “courts may, for reasons fixed by law, discharge juries from the consideration of any case,” Ala.Const. Art. I, § 9, and it is clear that by statute such reasons exist when there is shown “a manifest necessity for discharge or when the ends of justice would otherwise be defeated.” § 12-16-233, Code of Alabama 1975. The trial court *177 is thereby vested with a broad discretion in deciding whether there is in actuality such a “manifest necessity for discharge” or the possibility of injustice for, as stated in Brewer v. State, 24 Ala.App. 410, 137 So. 454, cert. denied, 223 Ala. 568, 137 So. 455 (1931):
“The statute'fixes the reason for a discharge of the jury and of necessity leaves it to the opinion or discretion of the judge or court to determine whether or not the reason as fixed by law really exists.”
See, Woods v. State, Ala., 367 So.2d 982 (1978); Shadle v. State, 280 Ala. 379, 194 So.2d 538 (1967); Perry v. State, Ala.Cr.App., 371 So.2d 969, cert. denied, Ala., 371 So.2d 971 (1979); Winnings v. State, 370 So.2d 323, cert. denied, Ala., 370 So.2d 329 (1979).
Our review of the testimony surrounding the point here complained of by appellant does not convince us that the court abused that discretion entrusted to it under the above cited authorities. It is, of course, clear that the State succeeded in introducing the knife into evidence, but it is equally apparent that the trial court then initiated questioning of Officer Meadows on the circumstances surrounding the discovery of the knife, discovered its error in admitting the knife, and then acted promptly to remove the piece of evidence from consideration, instruct and poll the jury. These actions of the trial court were proper, and rendered any error in previously admitting the knife into evidence harmless. Cf., Frost v. State, 225 Ala. 232, 142 So. 427 (1932); McHellen v. State, Ala.Cr.App., 351 So.2d 689 (1978); Retowsky v. State, Ala.Cr.App., 333 So.2d 193 (1976); Pennington v. State, 57 Ala.App. 655, 331 So.2d 411 (1976); Patrick v. State, 43 Ala.App. 338, 190 So.2d 551, cert. denied, 280 Ala. 717, 190 So.2d 555 (1966); Long v. State, 35 Ala.App. 164, 44 So.2d 775 (1950). There was no error by the trial court in refusing to grant a mistrial. McCart v. State, Ala.Cr.App., 387 So.2d 232, cert. denied, 387 So.2d 237 (1980).
We additionally note, at this point, that Officer Meadows was certainly free to testify as to his view of the knife on the seat of appellant’s car on the night in question, since it is clear from the facts that the knife was in open view and thus any sight of the knife was not the product of a “search.” See Vogel v. State, Ala.Cr.App., -So.2d-(Ms. October 28, 1980), and cases cited therein. The State further contends that the seizure of the knife was proper, either because it was in “plain view” or because appellant later waived the warrant requirement, but we find that we need not decide those issues since the “chain of custody” problems would still be evident.
IV
The following jury charges requested by appellant at trial were refused by the trial court:
“DEFENDANT’S REQUESTED WRITTEN CHARGE #1
“The Court charges the jury that you must find the defendant not guilty. “DEFENDANT’S REQUESTED WRITTEN CHARGE # 2
“The Court charges the jury that if you believe the evidence in this case you must find the defendant not guilty.”
The affirmative charge, as propounded in Charge 1, is, of course, properly refused where there is some evidence tending to present a jury question as to a defendant’s guilt or innocence.
“The general charge should never be given when there is any evidence, however, weak and inconclusive it may be, tending to make a case against the party who asks it.”
Grimes v. State, 24 Ala.App. 378, 135 So. 652 (1931). See, Kennebrew v. State, Ala.Cr.App., 356 So.2d 699, cert. denied, Ala., 356 So.2d 702 (1978); Mullins v. State, Ala.Cr.App., 344 So.2d 539, cert. denied, Ala., 344 So.2d 543 (1977); Curry v. State, Ala.Cr.App., 341 So.2d 972 (1976), cert. denied, Ala., 341 So.2d 974 (1977); Ala. Digest Crim. Law Key No. 753.2(5). Similarly, a charge identical in wording to that here contained in Charge 2 was held properly refused in Tate v. State, Ala.Cr.App., 337 *178 So.2d 13 (1976), where “[U]nder the evidence, the issue as to the appellant’s guilt was clearly for the jury’s determination.”
We have set forth the evidence adduced at appellant’s trial in some detail in the first portion of this opinion and decline to reiterate that evidence and its tendencies here. There was certainly a jury question presented as to appellant’s innocence or guilt, and the evidence was sufficient to support the jury’s determination of appellant’s guilt. The requested charges were therefore properly refused.
Our review of the trial record has disclosed no error therein. The judgment below is therefore affirmed.
AFFIRMED.
All the Judges concur.

. Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).