[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 852 
Stephen Jerome Fike was indicted for the intentional killing of one, Patricia Ann Culp, in violation of § 13A-6-2, Code of Alabama 1975. The jury found the appellant "guilty of murder as charged in the indictment." Following a habitual offender hearing, the trial judge sentenced the appellant to life imprisonment in the penitentiary.
On February 2, 1982, the body of Patricia Ann Culp was found lying in a culvert, in approximately six inches of water, alongside Interstate 59 in Tuscaloosa County. The body seemed to have sustained some type of injury to the head and a cut on the left wrist.
Dr. Henry Santina performed the autopsy on the body of the deceased. In his opinion, the cause of death was due to a fracture on the right side of the skull, which most likely resulted from a blunt instrument.
According to the appellant's statement, he went to Sammy's Go-Go Lounge in Birmingham around midnight on January 29, 1982. One of the dancers he knew introduced him to the deceased who was also a dancer. The appellant and the deceased then made arrangements for a date after she got off work.
Sometime around 2:00 a.m., January 30, 1982, the two drove in the deceased's red Mustang to the Highway Host Motel in Bessemer and registered as Mr. and Mrs. Stephen Culp. The two then had sex, he paid her $50 and they left. The last time the appellant saw the deceased was when she dropped him off at Banks Lounge at approximately 6:00 a.m. At 2:10 p.m. the appellant caught a plane to Atlanta.
The facts the appellant gave are somewhat different than those the police uncovered. The manager of the Highway Host Motel testified that the deceased and the appellant arrived in the early morning hours of January 30 at the motel in a red car. They registered and went to Room 330. The next morning the housekeeper discovered that one of the beds in Room 330 had been stripped and all the linens, bedspread, and blanket were missing from the room. Traces of blood were found in various areas of the motel room, including on the mattress.
Several witnesses testified as to seeing the appellant at the Omelette Shop near the Birmingham Airport on January 30 at approximately 10:00 a.m. The appellant was seen driving a red Mustang and asked one of the witnesses to look at it because he stated he had just purchased it. The witness *Page 853 
said the car the appellant was driving was similar to the one identified as belonging to the deceased.
Later that morning, the appellant bought some new shoes. He then went to the Ramada Inn near the airport around 1:00 p.m. He was seen changing clothes in the men's room at this time.
The appellant then gave a bag to the Ramada Inn desk clerk. The bag contained some shoes and keys. Next, the appellant asked the driver of the Ramada Inn van to take him to the Omelette Shop to get some cigarettes, which he did. Then the driver dropped him at the airport.
Later that day, one of the security officers for the Ramada Inn noticed a red Mustang with a broken window. When he looked inside the car, he found a tote bag which contained a sheer nightgown, panties, make-up and a pill bottle with the name Patricia Culp on it.
The police then processed the red Mustang for evidence. Photographs of Patricia Culp were found in the glove compartment. Blood was found in the trunk of the car. A tire tool with hair fibers on it was also recovered in the trunk. The hair fibers on the tire tool could have been from the head of the deceased. Hair fibers found in the car were similar to those of the appellant's hair.
Authorities in Decatur, Georgia picked up the appellant as being a fugitive from the State of Alabama after learning of the warrant for his arrest. The authorities transferred the appellant back to Birmingham. The shirt the appellant was wearing when he was picked up in Atlanta (Decatur) had blood of the same type as deceased's on it.
The most damaging testimony at trial was that of appellant's cousin, Virginia Bryant. She visited the appellant on February 8, 1982 at the Bessemer jail.
The appellant told her that, after he and the deceased had sex, he went to take a shower. When he came out of the bathroom, the deceased was going out the door with his money so he swung her down. She told him not to come any closer or she would slit her wrist, which she did. The appellant began hitting her and he thought he had killed her after he hit her with a board. He wrapped the deceased in a sheet and put her in the trunk of her car. As he was driving, he heard her kicking in the trunk so he stopped, dumped her on the ground and hit her on the head with the tire tool to make sure she was dead. The appellant then drove to Birmingham, washed the car, went to the Omelette Shop and took a flight to Atlanta.
When Bryant stated she did not believe the appellant's story, he changed it. He stated as he was getting out of the shower, a man came in the room and beat up both of them. The man then put the girl in the trunk and him in the back seat. The appellant lost consciousness and when he awoke, no one was in the car except himself.
 I
On the night of February 5, 1982, Sergeants Fred House and Max James of the Jefferson County Sheriff's Department went to pick up the appellant where he was being held in custody by authorities in DeKalb County, Georgia. Once they took custody of the appellant, the "Miranda Warnings" and waiver of rights were read to him, which he signed. At this point, the appellant stated that he did not want to make a statement and would only talk to Lieutenant Haynes of the Jefferson County Sheriff's Department or Nolan Shivers of the Birmingham Police Department. No further questions were asked of the appellant and the officers and the appellant returned to Jefferson County.
When the three arrived at the Sheriff's Department, early on the morning of February 6, 1982, they were met outside by several members of the news media who attempted to ask the appellant some questions. One of the newsmen asked the appellant, "Will you plea?", to which he replied, "No comment." The reporter then asked, "Do you feel you are being held wrongly?" and the appellant stated, "No *Page 854 
comment without an attorney first." (R. 285).
At approximately 1:00 a.m., Lieutenant Haynes and Sergeant James questioned the appellant about the murder of Patricia Ann Culp. The appellant invoked his right to remain silent and he requested an attorney.
However, the interrogation of the appellant did not stop at this point, and a statement was obtained from the appellant. The State never attempted to introduce this statement. Had they done so, it would have been inadmissible because the rule set out in Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602,16 L.Ed.2d 694 (1966), that once an accused requests counsel, all interrogation must cease, was clearly violated.
The appellant was then transported to the Bessemer jail by Sergeant House. After House had transferred custody of the appellant to the warden, around 3:00 a.m., the appellant asked House to wait because he wanted to talk to him. House told the appellant to get some sleep and to call him that afternoon if he still wanted to talk. The appellant said that he wanted to make an appointment now and House agreed to talk to him that afternoon.
At approximately 2:30 p.m., House went back to the jail to talk to the appellant pursuant to his request. House re-read the appellant his Miranda warnings and the appellant gave him a statement. House testified that at the time he obtained the statement from the appellant, he was not aware that the appellant had told the newsmen that he wanted an attorney or that he had requested one when he was being interrogated by James and Haynes.
After hearing the above facts, the trial judge determined the appellant's statement had been voluntarily made and allowed its admission into evidence.
 I (A)
The appellant claims that the statement should not have been admitted because he invoked his right to counsel and did not thereafter waive that right.
Clearly, the burden is on the State to establish that the appellant knowingly, intelligently and voluntarily waived his right to counsel.
 "It is reasonably clear under our cases that waivers of counsel must not only be voluntary, but must also constitute a knowing and intelligent relinquishment or abandonment of a known right or privilege, a matter which depends in each case `upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused.' Johnson v. Zerbst, 304 U.S. 458, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938). See Faretta v. California, 422 U.S. 806, 835, 95 S.Ct. 2525, 2541, 45 L.Ed.2d 562 (1975); North Carolina v. Butler, 441 U.S. 369, 374-375, 99 S.Ct. 1755, 1758, 60 L.Ed.2d 286 (1979); Brewer v. Williams, 430 U.S. 387, 404, 97 S.Ct. 1232, 1242, 51 L.Ed.2d 424 (1977); Fare v. Michael C., 442 U.S. 707, 724-725, 99 S.Ct. 2560, 2571-2572, 61 L.Ed.2d 197 (1979)."
Edwards v. Arizona, 451 U.S. 477, 101 S.Ct. 1880,68 L.Ed.2d 378 (1981).
In Edwards, the United States Supreme Court stated that:
 [A]n accused . . . having expressed his desire to deal with police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police.
(Emphasis added).
As stated earlier, House was not aware that the appellant had invoked his right to counsel when he obtained the statement from the appellant. The appellant, himself, admits in his statement that he initiated this meeting with House. He had approximately twelve hours to think about this decision and still wanted to talk with House even after he had been read hisMiranda warnings again. The appellant stated that no threats or inducements, or promises or hope of reward were made to him in order to obtain his statement. *Page 855 
From our examination of the facts in the record, it is clear that the appellant voluntarily, intelligently and knowingly waived his right to counsel, having previously invoked that right and therefore his statement was properly admitted into evidence.
 (B)
The appellant further contends that the statement was inadmissible because it was the fruit of the clearly inadmissible statement taken by James and Haynes.
 "The rationale for excluding any confession made after an involuntary one is that the later confession flows from the same improper influence or inducement as the earlier one. United States v. Bayer, supra; McAdory v. State, 62 Ala. 154 (1878); Levison v. State, 54 Ala. 520 (1875); Cook v. State, 16 Ala. App. 390, 78 So. 306 (1918). By the same token, once it is shown that the improper influence or inducement has been dispelled, there is no reason not to admit the subsequent confession. Cook v. State, supra. In Levison v. State, supra, the court observed:
 `The first confession is regarded as the parent of the succeeding confessions, and that being improperly obtained, vitiates the second, unless it appears the influence extracting the first has been removed, and all connection between the two dissevered.' [Emphasis added]."
Hollis v. State, 399 So.2d 935 (Ala.Cr.App. 1981).
 "In the case of United States v. Bayer, 331 U.S. 532, 67 S.Ct. 1394, 91 L.Ed. 1654, the Supreme Court reaffirmed the proposition that, although it is difficult to visualize a case in which the motivating facts that produced the initial illegal confession are no longer a moving consideration entering into the giving of a subsequent admission, there are such cases."
Williams v. United States, 328 F.2d 669 (5th Cir. 1964). The case at bar is such a case.
The State has the burden of showing to the trial court that the problem which made the first statement illegal no longer existed when the second statement was made. We conclude this was done in this cause.
Our conclusion is supported by the opinion in Edwards, supra. In Edwards, the defendant was arrested on a criminal charge. He was given his Miranda warnings and the police attempted to question him about the charge. The appellant invoked his right to counsel and interrogation ceased. The following day, the police again questioned the appellant after having read him hisMiranda warnings again. At this time, the defendant stated he was willing to talk and gave the officers a statement.
The United States Supreme Court held that the second statement obtained from the defendant was inadmissible because the police had initiated the interrogation rather than the defendant.
 "In concluding that the fruits of the interrogation initiated by the police on January 20 could not be used against Edwards, we do not hold or imply that Edwards was powerless to countermand his election or that the authorities could in no event use any incriminating statements made by Edwards prior to his having access to counsel. Had Edwards initiated the meeting on January 20, nothing in the Fifth and Fourteenth Amendments would prohibit the police from merely listening to his voluntary, volunteered statements and using them against him at trial. The Fifth Amendment right identified in Miranda is the right to have counsel present at any custodial interrogation. Absent such interrogation, there would have been no infringement of the right that Edwards invoked and there would be no occasion to determine whether there had been a valid waiver." (Emphasis added).
Edwards v. Arizona, supra.
We hold the appellant in this case, after having invoked his right to counsel, thereafter waived that right. The illegality of the first statement no longer existed *Page 856 
since the appellant initiated the conversation with House.
Therefore, based on the totality of the circumstances, we find the appellant's statement was voluntarily given and was here properly admitted into evidence.
 II
The appellant asserts several exhibits were improperly admitted into evidence because the State failed to show a proper chain of custody.
 "To warrant the reception of an object in evidence against an objection that an unbroken chain of custody has not been shown, it is not necessary that it be proved to an absolute certainty, but only to a reasonable probability, that the object is the same as, and not substantially different from, the object as it existed at the commencement of the chain. Dennison v. State, 259 Ala. 424, 427, 66 So.2d 552
(1953); Mullins v. State, 56 Ala. App. 460, 323 So.2d 109 (1975); Jemison v. State, 40 Ala. App. 581, 120 So.2d 748 (1960)."
Sexton v. State, 346 So.2d 1177 (Ala.Cr.App.), cert. den.,346 So.2d 1180 (Ala. 1977).
We do not find it necessary to detail the chain of custody of every item which was admitted into evidence. Suffice it to say, we have examined the record and find that the State sufficiently established a proper chain of custody with regard to each of the exhibits to which the appellant objects. These exhibits were properly admitted into evidence.
 III
The appellant contends a mistrial should have been granted in this case because the prosecutor, during his closing argument, made reference to facts not in evidence.
The pertinent portion of the record is as follows:
 "MR. TUCKER: But, they brought out that there was a mattress pad found. What did Mr. Ladner bring out to you? Culp's blood. That mattress pad had the same type and same blood enzyme group as this right here, ABO, O, Ak 2-1, Gc 1-1, and EAP-B. It also matched the blood off the mattress cover, the mattress pad which also matched the mattress in Room 330. I feel with all of my heart those sheets were the sheets from the room. But, I could not get them in evidence. I wasn't going to try. I wasn't going to jeopardize my case. I wasn't trying to hide stuff from you. But, I'm only going to present evidence I think is competent and legal evidence. If you want to talk about that and make a big stink about it I could tell you right now that is what it was. They were found at a trailer park two and a half miles from the motel." (R. 602).
The prosecutor did refer to several facts which were not in evidence in the above quote. This does not necessitate a mistrial in this case.
Defense counsel opened the door to any argument by the prosecutor concerning the sheets because of his own remarks during his closing argument. Those remarks are set out below:
 "MR. LADNER: You heard from the blood lady, Elaine Scott. You heard me ask her on cross-examination about sheets she examined. Two different sheets. What did you find on those sheets, Ms. Scott? Blood.
 "You examined a pillow and pillow case. What was on the pillow and pillow case? Blood.
 "Where are those sheets? Where is the pillow and pillow case? Where did they come from? They didn't come from the motel room. Where did they come from?
 "You heard the lady from the motel testify the sheets were gone. There wasn't any testimony that these sheets were recovered from the car, from the scene. No evidence.
 "Where the heck did they come from? I don't know. I don't know." (p. 2, second supplemental record).
The prosecutor's argument was merely a reply in kind to defense counsel's argument and was not improper. See Helton v. *Page 857 State, 433 So.2d 1186 (Ala.Cr.App. 1983); Miller v. State,431 So.2d 586 (Ala.Cr.App. 1983).
Furthermore,
 "`. . . [T]he general rule is that prejudicial statements, even though improper, are considered capable of being eradicated by the trial judge in sustaining objections thereto or by appropriate instructions to the jury or both. Allred v. State, [291 Ala. 34, 277 So.2d 339 (1973)], supra; Dunn v. State, 277 Ala. 39 at 44, 166 So.2d 878 (1964); Bachelor v. State, 216 Ala. 356, 361, 113 So. 67
(1927); Anderson v. State, 209 Ala. 36, 44, 95 So. 171 (1922).' (Emphasis added). Meredith v. State, 370 So.2d 1075 (Ala.Cr.App.), writ denied, 370 So.2d 1079
(Ala. 1979); Miller v. State, 431 So.2d 586
(Ala.Cr.App. 1983)."
Carroll v. State, 440 So.2d 343 (Ala.Cr.App. 1983).
The trial judge in this case immediately sustained defense counsel's objection to the prosecutor's remarks. He later instructed the jury only to base their verdict on the evidence they heard during the trial and counsels' arguments are not evidence. Surely the trial judge cured any prejudice to the appellant by the prosecutor's remark by sustaining the objection and his instruction. Ellenburg v. State,353 So.2d 810 (Ala.Cr.App. 1977).
Lastly, the determination of whether a mistrial should be granted is left to the sound discretion of the trial judge.Shadle v. State, 280 Ala. 379, 194 So.2d 538 (1967); Favor v.State, 389 So.2d 556 (Ala.Cr.App. 1980).
We do not find the trial judge in this case abused that discretion. Therefore, the trial judge properly refused defense counsel's motion for a mistrial.
 IV
The appellant's contention that the Circuit Court of Jefferson County, Bessemer Division, did not have jurisdiction in this case is without merit. He asserts there was no evidence that the victim was killed in Jefferson County and, therefore, jurisdiction should lie in Tuscaloosa County, Alabama, where the body was found.
From our examination of the record, we find ample evidence to support the contention that the victim was killed in the Bessemer Division of Jefferson County. Therefore, the trial judge correctly refused defense counsel's motion to dismiss for lack of jurisdiction.
 V
The appellant urges his motion for a change of venue was improperly refused due to the existence of widespread pre-trial publicity surrounding his case.
 "Section 15-2-20, Code of Alabama 1975 states that a defendant is entitled to a change of venue to another county if he can show to the reasonable satisfaction of the trial court that a fair and impartial trial cannot be had in the county in which the indictment is found. Anderson v. State, 362 So.2d 1296
(Ala.Cr.App. 1978)."
Nelson v. State, 440 So.2d 1130 (Ala.Cr.App. 1983).
We agree that a great deal of pre-trial publicity existed in this case but that, in itself, does not mean that the accused will not receive a fair and impartial trial. Anderson, supra;Nelson, supra; Dolvin v. State, 391 So.2d 666 (Ala.Cr.App. 1979), aff'd, 391 So.2d 677 (Ala. 1980).
An accused is entitled to a change of venue if he can affirmatively demonstrate to the trial court that the pre-trial publicity "has so saturated the community as to have a probable impact on the prospective jurors" or that there is "a connection between the publicity generated by the news articles, radio and television broadcasts and the existence of actual jury prejudice." Nelson, supra.
The trial judge in this case reviewed videotapes of local television, broadcasts and articles in local newspapers to determine if this publicity created a "prejudicial atmosphere" against this appellant which could render his trial "inherently suspect." *Page 858 
After examining the appellant's exhibits, the trial judge stated he found "nothing intrinsically prejudicial" about this publicity and the appellant had been "insulated by the passage of time from these articles." (R. 15). Approximately nine months elapsed from the murder until the appellant's trial.Robinson v. State, 430 So.2d 883 (Ala.Cr.App. 1983).
In light of the fact the trial judge in this case was in the best position to determine whether the effect of the pre-trial publicity prejudiced the appellant to the extent that he could not receive a fair and impartial trial in Jefferson County, we hold the trial judge correctly denied the appellant's motion for a change of venue. Robinson, supra, and authorities cited therein.
Further, the appellant failed to demonstrate to the trial court the existence of any actual jury prejudice due to the pre-trial publicity. The trial judge allowed extensive voir dire concerning each prospective juror's knowledge of the case and any bias they had based on their knowledge of the case. Those prospective jurors who felt they would be unable to render an unbiased verdict were dismissed. Moreover, defense counsel told the trial judge he was satisfied with the jury after the same had been struck.
Therefore, we hold that the jury in this case rendered an impartial verdict based solely on the evidence which they heard at trial. The trial judge properly exercised his sound discretion by denying the appellant's motion for a change of venue. Dobbert v. Florida, 432 U.S. 282, 97 S.Ct. 2290,53 L.Ed.2d 344 (1977).
 VI
At one point during the trial, Penny Dockery was called as a witness for the State. Although the demeanor of a witness cannot be accurately described in a typed record, defense counsel stated she was "on the verge of tears, trembling, and frightened." (R. 388). The State attempted to elicit from this witness the substance of a phone conversation she supposedly had with the appellant.
Defense counsel objected to this witness testifying about the substance of the conversation and moved for a mistrial because this witness' demeanor prejudiced the appellant's right to a fair trial. The trial judge sustained defense counsel's objections but thought it was unnecessary to declare a mistrial. Instead, he instructed the jury to disregard any response by the witness and any questions that had been asked of her.
This court in Poellnitz v. State, 48 Ala. App. 144,262 So.2d 631 (1972), quoting the Alabama Supreme Court in Shadle v.State, 280 Ala. 379, 194 So.2d 538 (1967) stated:
 "`. . . [I]t is well recognized that the granting of a mistrial is within the sound discretion of the trial court, for he, being present, is in a much better position to determine what effect, if any, some occurrence may have upon the jury's ability to decide the defendant's fate fairly and justly. And we will not interfere with the trial judge unless there had been a clear abuse of discretion. . . .'"
We believe the trial judge eradicated any prejudice that might have been sustained by the appellant due to this witness' testimony, by his instructions to the jury. Therefore, we hold the trial judge properly denied defense counsel's motion for a mistrial. Retowsky v. State, 333 So.2d 193 (1976); Glenn v.State, 395 So.2d 102 (Ala.Cr.App. 1980), cert. den.,395 So.2d 110 (Ala. 1981); Mitchell v. State, 397 So.2d 169 (Ala.Cr.App. 1980) cert. den., 397 So.2d 178 (Ala. 1981) and Hatch v. State,398 So.2d 415 (Ala.Cr.App. 1981).
 VII
The appellant contends the jury was improperly allowed to separate during the course of the trial.
Section 12-16-9 (d), Code of Alabama 1975 provides:
 "In the prosecution of any noncapital felony the trial court in its discretion may permit the jury trying the case to separate during the pendency of the trial, *Page 859 
provided that the court may at any time on its own initiative or on motion of any party, require that the jury be sequestered under the charge of a proper officer whenever they leave the jury box or the court may allow them to separate. A motion to separate or sequester shall not be made within the hearing of the jury, and the jury shall not be informed which party, if any, requested separation or sequestration. (Acts 1943, No. 384, p. 358; Acts 1982, No. 82-566.)"
"There is a rebuttable presumption that an accused is not prejudiced by allowing the jury to separate. Wright v. State,57 Ala. App. 401, 328 So.2d 650 (1976)." Willis v. State,441 So.2d 1030 (Ala.Cr.App. 1983).
The trial judge in the instant case repeatedly instructed the jury not to read or listen to anything concerning this case after they were allowed to separate and questioned them each morning before trial as to whether they had been able to follow his instructions. The trial judge believed there was no reason to sequester the jury during the trial and the appellant has not shown that he was prejudiced in any way by any such separation.
Therefore, we find no abuse of discretion in the trial judge's decision to allow the jury to separate during this appellant's trial. No injury has been shown.
 VIII
The appellant objects to the admission into evidence of certain photographs depicting the deceased's wounds. The photographs showed the deceased's exposed skull and depicted the fractures which had been inflicted to the victim's skull.
While we admit these photographs were most unpleasant,
 "[t]he fact that a photograph is gruesome and ghastly is no reason for excluding it, if relevant, even if the photograph may tend to inflame the jury. Richards v. State, Ala.Cr.App., 337 So.2d 171, cert. denied, Ala., 337 So.2d 173 (1976)."
Carpenter v. State, 400 So.2d 417 (Ala.Cr.App. 1981); Cheathamv. State, 431 So.2d 1350 (Ala.Cr.App. 1983); Brodka v. State,53 Ala. App. 125, 298 So.2d 55 (1974).
 ". . . As a general rule photographs are admissible in evidence if they tend to prove or disprove some disputed or material issue, to illustrate or elucidate some other relevant fact or evidence, to corroborate or disprove some other evidence offered or to be offered, and their admission is within the sound discretion of the trial judge. Fletcher v. State, 291 Ala. 67, 277 So.2d 882 (1973); Thigpen v. State, 50 Ala. App. 176, 277 So.2d 922 (1973)."
Carpenter, supra; Cheatham, supra.
The photographs at issue were used during the testimony of Dr. Henry Santina, who performed the autopsy on the deceased, to corroborate and illustrate his testimony concerning the location and extent of the deceased's injuries. The photographs were relevant evidence and thus, properly admissible for this purpose. McAdams v. State, 378 So.2d 1197 (Ala.Cr.App. 1979).
Furthermore, in the case the appellant cites for authorityMcKee v. State, 33 Ala. App. 171, 31 So.2d 656 (1947), this court recognized the relevancy of photographs of the internal
injuries of a deceased which allegedly caused the death. However, the court cautioned that a jury should not be exposed to such areas of photographs which are unreasonably gruesome and are not relevant to aid the jury in understanding the nature and gravity of the deceased's injuries.
In the case at bar, the trial judge was particularly careful to limit the photographs to only "those aspects that . . . reflect the injuries to the skull." (R. 181).
Therefore, we find the photographs of the deceased's skull were properly admitted into evidence. See Annotation 73 ALR 2d 769.
We have examined this record and find it free of error. The judgment of the trial court is due to be and is hereby affirmed.
AFFIRMED.
All the Judges concur. *Page 860